# BEDFORD *v.* EASTERN BUILDING AND LOAN ASSOCIATION.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 153.    Argued January 30, 31, 1901. — Decided April 22, 1901.

The Building Association, a corporation organized under the laws of New York, was authorized by law to make advances to its members. The statutory provisions regarding such advances and the securing of the same are stated in the opinion of the court. Bedford, a resident in Tennessee, became a shareholder by subscription to the stock, and by payment therefor. The statutes of Tennessee authorized the corporation to do business in that State. Bedford, after subscribing to the stock, paid his subscription, and on his application secured a loan from the corporation and mortgaged his property to secure it. All this was authorized by the statutes of Tennessee at the time when it was done. Subsequently a new statute was enacted, the provisions in which are set forth in the opinion of the court, and an act was passed concerning building associations, the parts of which thereof, relating to foreign building associations, are also set forth in the opinion of the court. The Building Association subsequently filed its charter with the secretary of state of Tennessee, and an abstract of the same in the office of the Register of Shelby County, but it did not comply with the building association laws. Bedford defaulted in his payments on the notes, and the association filed a bill in equity in the United States Circuit Court to foreclose the mortgage, and collect the amount due under his contract. Bedford answered that

the notes and mortgage violated the laws of Tennessee, and were void.
*Held:*

(1) That Bedford's subscription to the stock of the association, its issu-
    ance, and the application of a loan in pursuance of it, constituted
    a contract, which is inviolable by the state legislature.

(2) That by his subscription to the stock of the association, Bedford be-
    came a member of it, bound to the performance of what its by-laws
    and charter required of him, and entitled to exact the performance
    of what the by-laws and charter required of the association.

This court recognizes the power of a State to impose conditions upon for-
eign corporations doing business within the State, but that cannot be
exercised to discharge the citizens of the State from their contract obli-
gations.

THIS suit was brought in the Circuit Court of the United
States for the Western District of Tennessee by respondent to
foreclose a mortgage executed by petitioners. A decree was
entered in favor of the respondent. 88 Fed. Rep. 7. There
was an appeal taken to the United States Circuit Court of Ap-
peals for the Sixth Circuit. From that court the case came
here on certificate. Subsequently a writ of certiorari was is-
sued.

The following are some of the material facts contained in the
statement of the Circuit Court of Appeals. Other facts will be
stated in the opinion:

" The Eastern Building and Loan Association of Syracuse,
N. Y., is a corporation organized under the laws of the State
of New York for the purpose and with the power of conduct-
ing a general building association business in New York and
other States. Its plan of organization is similar to that gener-
ally adopted by such associations. Subscribers to its stock pay
$1 initiation fee for each share of $100 and 75 cents per month
as dues on each share and certain fines on default, and when
the whole amount of dues and dividends paid in amount to
$100, the holder is entitled to withdraw the same. Borrowing
members receive par value of their shares in advance and secure
their compliance with requirements as to dues, fines and inter-
est by mortgage or otherwise. Prior to March 26, 1891, the
association had a soliciting agent in Memphis, Tennessee, whose
duty it was to solicit persons to become members of the asso-
ciation and to subscribe to its stock. The agent had no au-

thority to accept applications for membership or subscriptions for stock but only the authority to transmit them by mail to the office of the company in Syracuse, New York, where they were accepted or rejected by the board of directors of the association. Three months after a person had subscribed for stock and the stock had been issued to him, he was, by the by-laws of the association, permitted to apply for an advance of the nominal par value of his shares, or, in effect, a loan. This application was forwarded through the soliciting agent to the company at Syracuse, together with the certificate of stock, already issued, as a pledge and a statement of the value of the property which it was proposed to mortgage to secure the loan. The application was accompanied by a recommendation of what was called 'the local board' in regard to the wisdom of the loan. The local board consisted of certain stockholders of the association living at the applicant's place of residence who had been elected by all the resident stockholders, and whose duty it was to advise the association at Syracuse concerning the value of the property offered and the character of the applicant. The local board had officers, one of whom was a treasurer, through whom members might, if they desired, forward payments due to the association at Syracuse, but the by-laws stated that in so doing the local treasurer was acting as agent for the stockholders and not for the association. Another by-law provided that all payments should be made to the secretary of the association at the home office in registered letter, express or money order or drafts."

On the second day of January, 1891, H. L. Bedford, one of the petitioners, then being a resident of Shelby County, Tennessee, made application in due form, and under seal, to become a member of the association, and subscribed for forty-six shares of instalment stock. He delivered the application to the soliciting agent of the association at Memphis, to be forwarded to Syracuse. He agreed in the application " to abide by all the terms, conditions and by-laws contained or referred to in the certificate of shares," and to comply with the rules and regulations of the association ; and he appointed the secretary of the association as proxy to appear and vote on his shares.

On the 2d of February, 1891, the certificate of stock was issued by the association and sent to its soliciting agent at Memphis, who, a few days later, handed it to Bedford. The certificate was numbered 4773, and stated the number of shares to be forty-six, and the amount $4600; date of maturity, August 1, 1897. It certified that Bedford was thereby constituted a member of the association and holder of forty-six shares therein of $100 each. "The terms, conditions and by-laws printed on the front and back" of the certificate were made part of the contract, and it was stated "that this certificate of shares is issued. to and accepted by the holder thereof upon the following express terms and conditions."

These conditions were substantially as follows:

The payment of a monthly instalment of seventy-five cents on each share until it matures or is withdrawn; a fine of ten cents per share per month for each month if the payment of the instalment shall be in arrears; declaring the stock non-forfeitable; providing for its sale at auction if the monthly instalments due thereon be in arrears for six months or more, and providing for the application of the proceeds of the sale and the payment of such instalments and accrued fines; the balance remaining, if any, to be paid to the member in whose name the stock stands at the time of sale. "If the stock brings no more than enough to pay the accrued fines and monthly payments, it shall be bid in by the association and cancelled, and the amount standing to the credit thereof in the loan fund shall be divided among the other shares as profits."

Further conditions of the stock were "(4) that members could withdraw their monthly instalments at any time by giving thirty days' notice, and to receive six per cent annual interest on all shares of six months' standing and up to two years; the third year, seven per cent; any time after the third year and before maturity, eight per cent. (5) If a shareholder died, his personal representative could continue or withdraw his share. (6) At stated periods the profits arising from interest, premiums, fines and other sources shall be apportioned among the shares in good standing. (7) All payments were required to be paid to an authorized agent or sent to the secretary at the home of-

fice. (8) Reservation of a right in the association to make investigation prior to approval of claims. '(9) The by-laws of this association, which are attached to and endorsed hereon, are a part of this contract, and such by-laws and this certificate are to be construed together as part of the contract between the association and the shareholder.' (12) No shareholder to have an interest in the affairs, assets or funds of the association, except as above stated, or to assume liability except as hereafter described. (13) Upon the cessation or determination of the contract, all payments made thereon shall become forfeited to the association. (14) Actions to be brought within six months after filing proofs in the county of Onondaga, in the State of New York. (15) 'No agent has authority to change this contract, and the association assumes no liability for any statements not contained in its printed literature.'"

The certificate concluded as follows:

"Given under the seal of said association at Syracuse, New York, the second day of Feby., A. D. 1891.

"H. H. Loomis, *President.*

[L. S.] "Jno. W. Reynolds,

"*Secretary and Gen'l Manager.*"

On the 20th of March, 1891, Bedford made an application for a preference for an advance, which was forwarded through the same soliciting agent to Syracuse. Bedford described in detail the real estate upon which he proposed to give the association a mortgage. This application was approved May 18, 1891, by the board of directors at Syracuse. Bedford then applied on June 20 for the loan in the letter following:

"*Application for an Advance.*

"To the Board of Directors of the Eastern Building and Loan Association of Syracuse, N. Y.:

"Gentlemen: At a regular meeting of your board, held May 18, 1891, having obtained the preference for an advance on forty-six shares of No. 4773 of your association, at a premium of ten per cent, I now respectfully request the advance be granted. I hereby agree to comply with the charter and

by-laws of your association and all requirements defined by your committee of the board of directors.

"H. L. BEDFORD, *Applicant.*

"Witness: J. H. T. MARTIN."

This letter was accompanied by a mortgage to the association, duly executed and acknowledged by Bedford and wife before a notary in Shelby County, Tennessee, of the land in that county previously tendered as security. The mortgage had been duly recorded in Shelby County.

The defeasance clause of the mortgage recited among other things that the "grant is intended as security for the payment of the sum of fifty-six hundred-eighty-three and $\frac{8}{100}$ dollars, the same being the principal, interest and premium of a loan from said association, which said loan was made pursuant to and accepted under the provisions of the by-laws of said association, and which said by-laws have been read by the mortgagor, H. L. Bedford, and are made a part of this contract, which said loan is evidenced and secured to be paid by seventy-eight (78) certain promissory notes of even date herewith, executed by the said H. L. Bedford, payable to the said association at its office in Syracuse as follows: One of each of said notes to be paid on or before the last Saturday of each and every month until all of said seventy-eight notes are fully paid, together with the interest, and each of said notes after maturity at the rate of six (6) per cent per annum, payable semi-annually, until said notes are fully paid. And the said mortgagor, H. L. Bedford, for himself and his heirs, executors, administrators and assigns, hereby covenants and agrees with the party of the second part, its successors and assigns, to pay said principal, interest and premiums at maturity and the interest accruing on said notes after maturity, and all fines and penalties that may be imposed pursuant to the provisions of the constitution and by-laws of said association, and also to keep and perform all promises and engagements made and entered into with said association according to the true intent and meaning of its by-laws and articles of association. . . ."

The seventy-eight notes were all of the same tenor, *mutatis mutandis*, as the following:

"On or before the last Saturday of June, 1893, I promise to pay seventy-two and 86–100 dollars, ($72 86–100,) to the order of the Eastern Building and Loan Association at its office in Syracuse, N. Y. Value received.

" Bailey, Tenn., May 1, 1891.          H. L. BEDFORD."

The business of the association in Tennessee had been lawful down to March 26, 1891, when the following act passed by the legislature of Tennessee went into effect:

## "CHAPTER 122.

"An act to amend chapter 31 of the Acts of 1877, declaring the terms on which foreign corporations organized for mining or manufacturing purposes may carry on their business and purchase, hold and convey real and personal property in this State, so as to make the provisions of said act apply to all foreign corporations that may desire to own property or to do business in this State.

"SEC. 1. Be it enacted by the General Assembly of the State of Tennessee, That chapter 31 of the Acts of 1877 be so amended and enlarged as that the provisions of said act shall apply to all corporations chartered or organized under the laws of other States or countries for any purpose whatsoever which may desire to do any kind of business in this State.

"SEC. 2. Be it further enacted, That each and every corporation created or organized under or by virtue of any government other than that of this State, for any purpose whatever, desiring to own property or carry on business in this State of any kind or character, shall first file in the office of the secretary of the State a copy of its charter and cause an abstract of same to be recorded in the office of the register in each county in which such corporation desires or proposes to carry on its business or to acquire or own property, as now required by section 2 of chapter 31 of Acts of 1877.

"SEC. 3. Be it further enacted, That it shall be unlawful for any foreign corporation to do or attempt to do any business or

to own or acquire any property in this State without having first complied with the provisions of this act, and a violation of this statute shall subject the offender to a fine of not less than $100 nor more than $500, at the discretion of the jury trying the case.

"Sec. 4. Be it further enacted, That when a corporation complies with the provisions of this act it shall then be, to all intents and purposes, a domestic corporation, and may sue and be sued in the courts of this State, and subject to the jurisdiction of the courts of this State just as though it were created under the laws of this State.

"Sec. 5. Be it further enacted, That when such corporation has no agent in this State upon whom process may be served by any person bringing suit against such corporation, then it may be proceeded against by an attachment to be levied upon any property owned by the corporation, and publication, as in other attachment cases. But for the plaintiff to obtain an attachment he, his agent or attorney, need only make oath of the justness of his claim, that the defendant is a corporation organized under this act, and that it has no agent in the county where the property sought to be attached is situated upon whom process can be served.

"Sec. 6. Be it further enacted, That said chapter 31 of the Acts of 1877, except in so far as the same is amended, enlarged and extended by this act, be and the same is declared to be in full force.

"Sec. 7. Be it further enacted, That this act take effect from and after its passage, the public welfare requiring it.

"Passed March 21, 1891."

Upon the same date an act was passed concerning building associations. The part thereof relating to foreign building associations was as follows (Chapter 2 of the Acts of 1891):

"Sec. 3. Be it further enacted, That no building and loan association organized under the laws of any other State, Territory or foreign government, shall do business in this State unless said association shall deposit and continually thereafter keep deposited in trust for all of its members and creditors, with some responsible trust company or with some state officer of

this or some other State of the United States, mortgages (or other securities) received by it in the usual course of its business amounting to not less than twenty-five thousand ($25,000) dollars nor more than fifty thousand ($50,000) dollars, at the discretion of the state treasurer. All of the personal obligations of its members taken in the ordinary course of business of such association and secured on first mortgage on real estate, all dividends and interest which may accrue on securities held in trust, as aforesaid, by the trust company or the State, as provided herein, and all dues or monthly payments which may become payable on stock pledged as security for loans, the mortgages for which are on deposit in accordance with the provisions of this act, may be collected and retained by the association depositing such securities or mortgages so long as such association remains solvent, and faithfully performs all contracts with its members. Any securities on deposit, as provided herein, may from time to time be withdrawn, if others of equal value are substituted therefor. Every building and loan association organized under the laws of any State, Territory or foreign government shall, before commencing to do business in this State—

"First. File with the treasurer of this State a duly authenticated copy of its charter or articles of corporation.

"Second. File with the treasurer of this State the certificate of the proper state officer of another State or the president and treasurer of some responsible trust company certifying that it has on deposit securities, not less than $25,000, taken in the regular course of business as mentioned in this act, in trust for all the members and creditors of such building and loan association.

"Third. File with the state treasurer a duly authenticated copy of a resolution adopted by the board of directors of such association stipulating and agreeing, that if any legal process affecting such association be served on said state treasurer, and a copy thereof be mailed, postage prepaid, by the party procuring the issuing of the same, or his attorney, to said association, addressed to its home office, then such service and mailing of such process shall have the same effect as personal service on said association of this State.

" Fourth. Pay the state treasurer twenty-five ($25) dollars as fees for filing the papers mentioned in this section.

" Sec. 7. Be it further enacted, No officer, director or agent of any foreign building and loan association shall, in this State, solicit subscriptions to the stock of such association, or sell, or knowingly cause to be sold or issued, to a resident of this State any stock of an association while said association has not on deposit securities as required by section 3 of this act, or before said association has complied with all the provisions of this act. License to agents of such companies or associations shall be issued by the treasurer annually, on the first of January, and said treasurer is authorized to collect from each agent for said license $2 fee.   Any violation hereof shall be deemed a misdemeanor, and upon conviction shall be punished by a fine of not less than ten dollars or more than fifty dollars."

The association filed its charter with the secretary of state of Tennessee on the 11th day of August, 1893, and filed an abstract of the same in the office of the register of Shelby County on August 15, 1893. , The association did not comply with the building association laws quoted above in any respect.

There is no evidence that the association solicited stock subscriptions after March 26, 1891, but it does appear that it made several loans of the same kind as the Bedford loan upon stock already subscribed for after that date.

The Supreme Court of Tennessee has decided that notes and a mortgage executed under similar circumstances and made payable in Minnesota are Minnesota contracts, but that they are, nevertheless, void in Tennessee and cannot be enforced in the courts of Tennessee.   *United States Saving & Loan Company* v. *Miller*, 47 Southwestern Rep. 17, affirmed on appeal by the Supreme Court of Tennessee, December 18, 1897, without written opinion.

Bedford defau'ted in his payments on the notes, and the association filed a bill in equity in the Circuit Court of the United States for the Western District of Tennessee to foreclose the mortgage and collect the amount due under his contract.   The defendant Bedford answered, averring that the notes and mort-

gage were in violation of the above quoted laws of Tennessee, and were void and could not be enforced.

*Mr. Robert M. Heath* for Bedford and wife. *Mr. Heber J. May* and *Mr. W. C. McLean* were on his brief.

*Mr. William Hepburn Russell* for appellee. *Mr. William Beverly Winslow, Mr. Joseph W. Buchanan* and *Mr. H. Dart Minor* were on his brief.

Mr. Justice McKenna, after stating the case as above, delivered the opinion of the court.

The assignments of error, except one, present the question of the enforceability of the notes and mortgage under the Tennessee law, or, as the question may be put, whether there was a contract between the parties—a right in one and an obligation in the other arising from a consideration given and received; mutual covenants by which each party acquired the right to that which the other promised or engaged to do, and whether the laws of Tennessee, as interpreted by its courts, impaired that right?

(1) A recapitulation of the facts in this connection will be useful. The Eastern Building and Loan Association was organized under the laws of New York, and one of its purposes was to make "advances" to members. It had a capital stock of $50,000, divided into shares of $100 each. The funds of the association were divided into two classes—a loan fund and an expense fund. The articles of incorporation provided that "the loan fund shall consist of all receipts which do not go into the expense fund, as hereinbefore provided, together with all interests and accumulations from whatever source. No money can be drawn from the loan fund for any other purpose than the making of loans on security, as provided by the by-laws, and to pay amounts due withdrawing shareholders. The funds of the association not required for advances on shares may be invested by the board of directors in such securities as the savings banks of the State of New York are permitted to take, or

deposited at interest in the savings banks, trust companies or duly incorporated banks of said State, and which are in good standing."

The articles of incorporation and the by-laws also provided the manner of becoming a member of the association, the rights of a member and the obligations of the association. The entrance fee of new members and new shares were to be one dollar per share, monthly dues seventy-five cents, fines for non-payment of dues on unpledged stock twenty cents. And it was provided by sections 1 and 2, article XIX., under the heading "Contract of members," as follows :

"SEC. 1. The terms and conditions expressed in the certificate of stock, in connection with the application for membership and the by-laws of the association, form the contract between the association and each shareholder therein.

"SEC. 2. All persons desiring to become shareholders of this association must fill out, sign and deliver to the secretary an application according to the form adopted by the association, which said application shall be a part of said application with this association. Such applicant shall also pay a membership fee of one dollar per share for each and every share held by him.

\*      \*      \*      \*      \*      \*      \*      \*

"SEC. 16. All remittances for advance, instalments, premiums, monthly instalments, fines and penalties, interest and premiums, and all other payments shall be made to the secretary of the association at the home office, and in registered letter, express or money order or drafts. Individual checks shall not be received."

The other sections of the article provide for the manner in which the loan shall be made, upon what security, interest and premium and covenants, the manner of payment and prepayment, and the enforcement of payment and when shares may be cancelled and forfeited. "Punctuality and strict performance on the part of all members, borrowers and shareholders, in payment of fines, dues, interest, loans and premiums, are made the essence of the contract."

The articles also provide with what the stock shall be charged

and to what it shall be subject, the amount of monthly instalments to be paid and when paid, and when and to what extent and upon what terms shares may be withdrawn and for the issue of paid up stock.

Article XV of the by-laws is as follows:

## "Loans.

"SEC. 1. Each shareholder, for each share named in their certificate, shall be entitled to a loan of one hundred dollars from the association, provided they shall first make application for such a loan upon a blank furnished by the association for that purpose, if the condition of the loan fund in the treasury shall warrant it. All applications for loans shall be filed and numbered consecutively as received, and be examined and approved, or rejected, by the board in their regular order.

"SEC. 2. All shares must be in force three months before said shareholder shall be entitled to a loan. All applications for loans are part of the contract of the shareholders with this association. Nothing herein contained shall prevent the board of directors from loaning funds of the association to any member in greater sums than the above provided upon approved securities."

On the 2d of January, 1891, Bedford applied to become a shareholder of the association, and subscribed for forty-six shares of instalment stock. The application was accepted and a certificate of stock was issued to him on the 2d of February, 1891, and on the 20th of March, 1891, he presented a written application for a loan as follows: "———— ————do hereby make application for a loan of forty-six hundred ($4600.00) dollars, for six and a half years, to bear interest at the rate of five per cent per annum, and a premium of five per cent per annum, payable on or before the last Saturday of each month;" and to secure the sum agreed to give a mortgage on the real estate set forth in certain questions and answers which accompanied the application, which described with particularity the real estate and the improvements thereon, and stated that the loan was "for investment to relieve adjoining property." The property was stated to be of the value of $6000; and all of his prop-

erty easily to be worth $40,000. The application was sworn to and accompanied by the affidavit of three other persons that they regarded Bedford " as a prompt, upright, reliable person, pecuniarily responsible for his contracts."

The application and report of the local board of appraisers was received by the association on the 12th of May, 1891, by mail from H. B. Martin, the soliciting agent of the association. It was accepted and a loan granted on the 18th of May, and to secure the same the notes and mortgage in suit were subsequently executed.

The statutes of Tennessee relied on as a defence were passed March 26, 1891, and to repeat, the question is, did the subscription to the stock of the association, its issuance and the application for a loan in pursuance of it, constitute a contract which was inviolable by the state legislature? We think the answer should be in the affirmative. By his subscription to stock of the association Bedford became a member of the association— bound to the performance of what its by-laws and charter required of him, and entitled to exact the performance of what the by-laws and charter required of the association. Each acquired a right to what the other promised, and there were all the elements of a contract. We are compelled, therefore, to disagree with the views expressed by the Supreme Court of Tennessee, in *New York &c. Building & Loan Association* v. *Cannon*, 99 Tennessee, 344, notwithstanding our high respect for that learned tribunal. It was there contended that " Cannon, having become a stockholder in the association before the acts were passed, with a view to becoming a borrower, and for that purpose, and having made his application for a loan likewise before the acts passed, acquired a vested right to the consummation of the loan, and the association became legally obligated to complete it, and it was also unfinished business, which the association had a right, and which was its duty, to finish, notwithstanding the acts of the legislature." To this contention the court replied: " If we were to grant that the borrower had a vested right to the loan, and the association had a legal obligation to consummate it, still, it must follow that the contract could be entered into, and the loan and mort-

gage made, only in compliance with the law.  There was nothing to prevent the association from complying with the statutes and thus placing itself in the attitude where it could legally make the loan and take the mortgage if it were under obligation to do so, as it claims."

And the court observed that it could not be considered that the association and Cannon were winding up an old transaction and unfinished business, but were doing business in the sense of the statute and in defiance of its prohibition, and refused to enforce the mortgage of the association.  We cannot assent to the view that there is nothing to prevent the association from complying with the statutes.  The mere filing of its charter in a particular office—the secretary of state's or some other office—might be easily complied with, but the deposit with some responsible trust company or state officer of the State or some other State, of mortgages or securities of from $25,000 to $50,000 in amount, at the discretion of the state treasurer, might be impossible to comply with.  At any rate, the requirement is so very onerous that the association could justly decline to do business in the State on that condition.  It might indeed have the right to decline any condition and retire from the State, and from all it had the option to retire from.  But it could not retire from the execution of its contracts.  It contracted with Bedford to make him a loan if it had the means in its treasury and his security was good.  The State could not affect that obligation nor impair it.  " The obligation of a contract ' is the law which binds the parties to perform their agreement.' "  4 Wall. 452.  The building association was incorporated under the laws of New York to make loans to its members, and rights to a loan accrued to membership.  The condition of a loan existing—means in the treasury, a tender of good security—the contingent right became a vested one, a contract was formed, and, can there be a doubt, that it was enforceable against the association ?  If it could have been enforced by suit, it was properly yielded to without suit and possessed all legal sanctions.

We recognize the power of the State to impose conditions upon foreign corporations doing business in the State.  We

have affirmed the existence of that power many times, but manifestly it cannot be exercised to discharge the citizens of the State from their contract obligations.

It is claimed, however, that if the transactions between Bedford and the association were otherwise legal they were affected with usury, and to the extent that they were usurious they were unenforceable. The contention is that in making the loan of $4600 Bedford was required to pay a fixed premium of $460, and received only $4140, and that this constituted usury in Tennessee. This is made out because, it is said, Bedford was required to withdraw his stock and receipt in full, and could therefore get no benefit from future profits of the association; and, it is asserted, that thereby the loan became "fixed and certain and no element of contingency" remained, and the transactions are withdrawn from the principle expressed in *Spain* v. *Hamilton*, 1 Wall. 604, that "where the promise to pay a sum above legal interest depends upon a contingency, and not upon the happening of a certain event, the loan is not usurious." But the fact was not as asserted.

The stock was pledged as security for the advance, and the pledge was no more a withdrawal of the stock, terminating Bedford's ownership of it, than his mortgage was an absolute conveyance of his land. It is provided in section 3, article 19, that in addition to real estate security for a loan a shareholder shall "transfer in pledge to the association one share of the stock held by said shareholder, as *collateral security*, on all loans made by the association" to him. Besides, the transactions were not usurious under the laws of New York, where the notes were payable. *Concordia Savings &c. Association* v. *Reed*, 93 N. Y. 474. Therefore, the principle expressed in *Miller* v. *Tiffany*, 1 Wall. 298, applies. It was said in that case: "The general principle in relation to contracts made in one place to be performed in another is well settled. They are to be governed by the law of the place of performance, and if the interest allowed by the law of the place of performance is higher than that permitted at the place of contract, the parties may stipulate for the higher interest without incurring the penalties of usury. The converse of this proposition is also

well settled. If the rate of interest be higher at the place of the contract than at the place of performance, the parties may lawfully contract in that case also for the higher rate." See also *Anderson* v. *Pond,* 13 Pet. 78; *Railroad Company* v. *Bank of Ashland,* 12 Wall. 226; *Scotland County* v. *Hill,* 132 U. S. 107; *Cromwell* v. *Sac County,* 96 U. S. 57.; *Cockle* v. *Flack et al.,* 93 U. S. 344.

In *Pioneer etc. Loan Co.* v. *Cannon,* 96 Tennessee, 599, a note secured by mortgage was given to a building association and made payable at Minneapolis. It provided for the payment of five per cent interest per annum, a five per cent premium per annum, monthly, on or before the last Saturday of each month, and stipulated, further, that " any failure to pay interest or premium, when due, shall, at the election of the payee, make the principal, interest and premium at once due." Of the note and mortgage the court said : " The second assignment of error is that the note and mortgage were both usurious on their faces and nonenforceable. As already stated, the note stipulates on its face to pay five per cent interest per annum, at the office of the company at Minneapolis, Minn. This contract is a Minnesota contract, and is expressly authorized by the charter of the company and the laws of that State, which have been distinctly proved, and appear on the record." The assignment of error was held not well taken.

The Circuit Court adjudged Mrs. Bedford personally liable for the indebtedness to the association. This is conceded to be error, and it has been stipulated "that an order or decree may be entered in this cause releasing her from said liability upon such terms and conditions as to this court may seem just."

*The judgment of the Circuit Court will be modified in accordance with the stipulation, and, as modified, affirmed. Costs are awarded to Mrs. Bedford on her appeal to and in the Circuit Court of Appeals and in this court.*