# WHELPLEY *v.* ROSS.

---

Sealed Instruments; Principal and Agent; Usury; Equity; Building Associations; Estoppel.

1. The rule of the common law, that only parties named or described in a sealed instrument, or those in privity with them (which undisclosed principals are not), are entitled to sue, or liable to be sued, thereon, is not applicable in equity.

2. An equitable beneficial owner of real estate, the title to which is in the name of another, may maintain in his own name a bill in equity

against a building association to cancel a bond and a deed of trust on the real estate, given by such other person at his request to secure a loan made by the building association, upon the repayment of the loan; and it is no defense that the bond was a sealed instrument, the real purpose of the suit being not to rescind the bond or to be relieved from its operation, but to relieve the complainant's real estate from the operation of the deed of trust.

3. It does not necessarily follow that a building association loan is usurious because a larger sum is reserved to be paid than the principal and legal interest, the test to determine whether the loan is usurious usually being whether the promise to pay the sum above legal interest depends upon a contingency, and not upon the happening of a certain event. If it depends upon a contingency the loan is not usurious.

4. Where, in a suit in equity by a borrowing member of a building association against the directors of the association to cancel a deed of trust given by him, on the ground that his loan has been more than repaid, it appears that all of the nonborrowing stockholders in the series to which the complainant's loan belonged have been paid in full, which necessarily implies that their stock had fully matured and had reached its full value, so that the time had come when all of the shares of the series should be paid for and the series dissolved, and it further appears that the stock of the nonborrowing members cannot have fully matured unless that of the borrowing members has likewise matured, and that the matured value of the complainant's stock is sufficient to pay his loan,—he is entitled to a cancelation and release of the deed of trust.

5. In such a case, however, where the building association is a voluntary association and the defendants are its directors, and they are not shown to be stockholders or to have any money of the association in their hands, the complainant is not entitled to a personal decree against them for the amount of any overpayment by him on account of his loan,—especially where the money so overpaid has been paid out to the complainant's associates by the directors in settlements with them, presumptively with his consent. As a member of the association he is estopped by the act of its directors and bound by its by-laws.

No. 1461.   Submitted February 14, 1905.   Decided March 21, 1905.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia in a suit in equity to cancel a bond and deed of trust given to a building association to secure a loan, and for a personal decree against the defendants.                              *Modified and affirmed.*

The COURT in the opinion stated the case as follows:

This is a controversy between a so-called building association and one known as a "borrowing stockholder."

A number of persons, whose names are not given, combined in this District to form a voluntary unincorporated association known and designated as the Eastern Building & Loan Association, with the nine appellants, James W. Whelpley and others, first above mentioned, as its directors, the purpose of which was, according to the usual programme of building associations, and according to the specification in the first article of its by-laws, "to receive from and to loan to stockholders its funds, subject to the by-laws."

On March 13, 1893, one George W. Montgomery, an employee in the office of the appellee Ross, and conceded to have been acting as an agent for the latter in the transaction, borrowed from the association the sum of $2,200, having for the purpose become a stockholder to the extent of eleven shares of stock, for which he subscribed, and which were issued to him at the time. It would appear that the money was put up at auction, and that Montgomery became the highest bidder therefor by an offer to pay a premium of 70 cents on each sum of $100, or on each share of stock, which practically amounted to the same thing. For the repayment of the amount he executed and delivered to the association a bond under seal, conditioned for the payment in each month of $2.70 on each share of stock held by him, and all fines and forfeitures that might be incurred by him under the "constitution" of the association, until "full settlement should be made, as provided in such constitution;" and to secure this bond he gave a deed of trust by way of mortgage on real estate standing in his name, although really owned by the appellee Ross, and which real estate adjoined the city of Washington. The payment of $2.70 to be made monthly is stated to be $1 for principal, $1 for interest, and 70 cents as premium, and the whole payment to be made by the appellee on his eleven shares of stock was $29.70, which he continued to pay from the first Wednesday of March, 1893, to and including

the first Wednesday of July, 1903, a period of 125 months, during which the whole amount paid by him would seem to have amounted to the sum of $3,712.50.

What is called the "constitution" of the association would seem to have been no more than a series of by-laws, and which in fact are designated as by-laws, of which thirty-six are enumerated in the record. These provide for the mode of operation of the association, which is not too clearly set forth; for very much is left to inference, possibly because the mode of operation of such association was generally well known. So far as we are informed by the record the principal features, so far as they concern the present case, were these:

The members of the association were designated as stockholders, and it would seem that anyone could at anytime become a stockholder, either for the purpose of borrowing money from it, or for the purpose of investing his money at a profit; and it does not appear that there was any limitation upon the amount of stock which one might acquire, further than the amount for which he desired to pay, if he was an investor, or than the amount which he desired to borrow, if he proposed to become a borrower. The theory appears to have been that the so-called stock, when subscribed for,—for no stock in the ordinary sense of the term seems to have been ever issued,—represented the measure of the payments which the stockholders desired to make for their investment; that, if they desired merely to invest, they paid into the association at the rate of $1 a month for each share, and no other payment was required of them, except for fines and penalties, if any they should incur, and that they were required to pay only until by such payments and by the profits of the association from loans and from fines and penalties the stock should become of the full value of $200 a share, when the money was to be divided and the association dissolved. Or, rather, the organization was planned to be of indefinite duration by the issue, if we may so call it, of successive series of stock, of which each series constituted an organization in itself, independent of every other series, although the same persons might hold stock in the different series or in all

the series.   Each series was to be closed and dissolved when the stock in it became of the full value of $200 a share, and the limit of stock in each series was the amount that should be subscribed for within six months.

The association seems to have been organized in the year 1889, and in the year 1903, when these proceedings were instituted, there had been twenty-six series of stock issued.   Of these Ross, through his agent Montgomery, was in the 9th, and at the time of the institution of the suit Montgomery was the only stockholder and his stock the only stock outstanding in that series.   All the other stockholders had been settled with.   At least, the answer of the defendants avers that all the "nonborrowing" stockholders in that series, as well as in several other series, had "been paid off in full."

Section 17 of the by-laws provided that each stockholder should pay into the association $1 each month for each share of stock held by him during the continuance of the series to which his stock belonged.   And, as we have stated, this was all the payment that was required of investing or nonborrowing stockholders, other than possible fines and penalties.

Section 30 provided that stockholders might withdraw at any time, after giving one month's notice, and, if there was money in the treasury available for the purpose, should receive what is called the withdrawal value of their stock, which was the aggregate amount of the periodical payments made by them, and 60 per cent of the profit on each share of stock in the series, as reported in the last previous semiannual statement.

Section 33 provided that when every share of stock in a series should have reached the full value of $200, or whenever loans to the full value of every share of stock should have been made, each stockholder should receive the sum of $200 in money for each share of stock held by him; or, in case a loan should have been granted to him, the bond and mortgage should be satisfied or released, and the series should be dissolved.

Three sections provided specifically in regard to loans.   They were sections 19, 20, and 26.

Section 19 provided that, when there was more than $200 in

the treasury not subject to withdrawal, the board of directors should offer it at public auction to the highest bidder; who either was then or should thereupon become a stockholder in order to be entitled to receive the same, and who should have subscribed for one share of stock for each sum of $200 required.

Section 20 provided that the borrower, in addtion to the sum of $1 a month required to be paid by all stockholders on each share of stock, should pay, also, 6 per cent per annum interest on the amount of the loan, being $1 a month on each share of stock or sum of $200, and also the rate of premium on each share per month for priority of loan.

Section 26 provided that borrowing stockholders might repay their loans, and either continue their stock in the association, or receive the withdrawal value thereof if they desired to withdraw it, in which event it should revert to the association.

Under these circumstances the appellee Ross on October 21, 1903, filed his bill in equity in the supreme court of the District against the board of directors of the association, Montgomery, and the trustees under the deed of trust given to secure the loan, and in it, after stating the loan and the execution of the bond and deed of trust, he alleged that, by a just accounting, he had overpaid his indebtedness on the loan by the sum of $867.86; that the transaction was usurious; that Montgomery acted in it as his (Ross's) agent; that the property belonged to the complainant and Montgomery had no beneficial interest in it; that he (the complainant) had demanded from the association a release of the deed of trust, which was refused unless a further sum, claimed to be due under the loan, was paid; and that the association threatened to order a sale of the property for failure to pay the further dues demanded. And he prayed for a repayment of the amount claimed by him to have been overpaid, for a cancelation of the bond, and a release of the deed of trust.

The board of directors of the association and the two trustees under the deed of trust joined in one answer, in which they admitted the transaction between Montgomery and the association, but averred that it was not a loan, but an advance upon his

stock; and that payments for two or three years more would be required to make his stock equal to $200 a share, and to entitle him to a release of the deed of trust.  In the answer there is also this averment, which is deemed to be important, and which therefore we transcribe in full:

"These defendants say that, while the word 'loan' is used in the by-laws, the transaction hereinbefore referred to was really an advance on the said several shares of stock to the full value thereof, and the said association was organized and the said transaction had on the faith of the long-settled law in this District, as determined by the highest courts thereof, that such transactions were fully legitimate and authorized by law.  Said association consists of and has always consisted of, from time to time, a large and shifting number of stockholders or members. It has now reached its 26th series, and the first six series and the 8th, 10th, 11th, and 12th series have been paid off and settled in full, and all the nonborrowing stockholders in the 7th, 9th, and 13th to 19th series, inclusive, have been paid off in full; and all this while the said Montgomery was a member; and the amount received from him as interest and premium went into and was computed as part of the profits and value of the shares of stock in each of said series.  Those series were settled by reason of the accumulation of funds for which no bids were made, and which the association was therefore unable to loan or advance to stockholders, and the said Montgomery and the plaintiff were well aware of this condition of affairs and of these retirements of stock so made, so that they are estopped to claim any refund for any overpayment, whatever may be their rights as to a refusal to make further payments."

Montgomery answered, substantially admitting all the allegations of the complainant's bill, and consequently his own agency for Ross in the transaction and Ross's ownership of the property.

Instead of testimony a stipulation was entered into between the parties and filed in the cause, whereby it was agreed that certain facts should be taken as proved, and that the cause should be heard on the bill and answers and this stipulation so

far as it modified the pleadings. The facts stated in the stipulation, which included as an exhibit annexed to it a copy of the constitution or by-laws of the association, were substantially those which have heretofore been mentioned. They included also the statement that neither the complainant nor Montgomery had any other connection with the association, or held any stock therein, other than the transaction which has been set forth. Included in the stipulation also was the fact that semiannual statements had always been issued showing the value of the stock in the 9th series, and that in the statement of July 31, 1901, the value was shown to be $129.33 for each share.

The court rendered a decree, whereby the complainant was adjudged to recover the sum of $867.86 from the nine defendants, who constituted the board of directors; and it was ordered that the stock issued to Montgomery and the bond given by him should be canceled, and that the deed of trust should be released by the trustees. From this decree all the defendants, except Montgomery, have appealed.

*Mr. O. B. Hallam* and *Mr. W. M. Hallam* for the appellants.

*Mr. E. H. Thomas* and *Mr. F. H. Stephens* for the appellee.

Mr. Justice MORRIS delivered the opinion of the Court:

1. The first contention of the appellants under their assignments of error is that the appellee, not being a party to the bond executed by Montgomery to the building association, is not entitled to maintain this suit, in view of the well-settled rule of the common law, applicable to instruments of writing under seal, although not, as it would seem, to simple contracts, that only the parties named or described in such sealed instruments, or those in privity with them (which undisclosed principals are not), are entitled to sue or liable to be sued thereon. But we think that this contention is untenable, for the reason that the rule, except in special or exceptional cases, is not applicable in equity.

As we understand it, the complainant in this case, although in the bill of complaint he prays for the cancelation of the bond given by Montgomery and of the stock issued to him, as by the structure of his bill he was probably compelled to do, is neither seeking to enforce that bond nor to rescind it, or to be relieved from its operation. If we regard that bond alone and as standing by itself, the complainant may be said to have no interest whatever in it. What he is interested in is to relieve his property from the operation of the deed of trust given thereon by Montgomery, upon the assumption that the purpose had been satisfied for which the deed of trust had been given,— in other words, that the condition of the bond, which the deed of trust had been given to secure, had been fully performed. It is conceded, and whether it is conceded or not, we must hold, under our decision in the case of *Middle States Loan, Bldg. & Constr. Asso. v. Baker,* 19 App. D. C. 1, that if the complainant, subsequently to the transaction between Montgomery and the building association, had received from Montgomery a deed of conveyance of the property, he would have been entitled to sue in equity to free the property from the encumbrance upon it, if in fact the liability secured had been discharged. The privity of the estate would have entitled him to maintain such suit.

But it is argued that because he has no such conveyance he cannot maintain the suit. The argument, we think, is without merit. Had it been necessary for the complainant for any reason to have recourse to a court of equity in a suit against Montgomery alone to establish in himself a resulting trust in the property standing in the name of Montgomery, it is beyond question that, upon such showing as is made in this record and especially upon the admission of Montgomery, he would be entitled to a decree for a conveyance to him, or to its equivalent, a decree establishing the title in himself under a resulting trust. Now, in the present case, Montgomery concedes the title to be in him, and no one controverts the fact that he is the true owner of the property. There is, therefore, no good reason why he should not be entitled to maintain this suit, which might per-

haps be regarded as the consolidation of two equitable proceedings in one.

Three cases are cited in favor of the proposition that equity will not, any more than the common law, maintain a suit by an undisclosed principal to enforce the obligation of a sealed instrument.   They are *Briggs* v. *Partridge,* 64 N. Y. 357, 21 Am. Rep. 617; *Borcherling* v. *Katz,* 37 N. J. Eq. 156, and a case in the English court of chancery appeals, *In Pickering's Claim,* L. R. 6 Ch. 525.   But we think that, upon examination, none of these cases will be found pertinent.

The case of *Briggs* v. *Partridge* was not a suit in equity, as counsel for the appellants mistakenly suppose, but a suit at common law, or rather a suit under the code practice of the State of New York, but still essentially a suit at common law, wherein, upon a contract in writing under seal for the sale of some land, the vendor sought to hold the undisclosed principal of the vendee, who was in fact only an agent, for the stipulated purchase money.   The contract was executory, and the vendor was ready to execute it, but the vendee and his principal refused.   It was held that the suit could not be maintained. Plainly this is no authority in the present case.

In the case of *Borcherling* v. *Katz,* 37 N. J. Eq. 156, there was a bond for the payment of money, wherein the nominal obligee was in fact the agent of an undisclosed principal, and the latter sought in a suit in equity to hold the obligor for a breach of the covenant, upon the sole ground that he had no remedy at common law by a suit in his own name; but this was plainly no sufficient ground for recourse to equity.   The party had an adequate remedy at common law by a suit in the name of the agent to his own use.   And even if he had not, it is no ground for the jurisdiction of equity that a party by his course of conduct may have precluded himself from a suit in his own name.   Equity can only grant equitable relief in a case of equitable cognizance, and the mere disability of a party, through his own deliberate action, to sue at common law does not fall under any known head of equitable jurisprudence.

The case of *Pickering's Claim,* L. R. 6 Ch. 525, does not

greatly aid the appellant's contention. The report of the case is rather meagre and unsatisfactory; but sufficient appears to show that it has no great bearing upon the present controversy. It may perhaps be described as a case of a common-law claim incidentally injected into proceedings in equity. Two brothers had been in partnership and had separated. One of them formed a company for which he was agent; and the company subsequently became insolvent, and its affairs were wound up in the court of chancery. The other brother, in the meantime, had procured a valuable concession from a South American government, and sold an interest in it to the brother who had organized the company, for a consideration, part of which was paid in cash at the time and part remained on credit. The sale took the form of an instrument of writing under seal executed by the two brothers as obligor and obligee, without any reference whatever to the company, although the obligor was in fact acting as agent for the company in the transaction. Upon the insolvency of the company the obligee sought to prove his brother's liability to him as a claim against the company. It was held that it could not be allowed. The liability was one at common law between the obligor and the obligee, who both acted in full knowledge of the situation; and the rule of the common law in regard to the enforcement of the claim was not changed by the fact that the affairs of the company had come into the control of a court of equity for the purpose of being wound up and settled. Moreover, the case does not hold that, if it had been shown that the company had received the benefit of the transaction, it could not have been held, at least to the extent of the benefit. In other words, while there was a suit pending in equity, the claim presented was merely a claim at common law upon the bond. An analogous case would have been presented here if the building association had sought to hold the complainant personally upon the bond given by Montgomery.

We are of opinion that the appellee was entitled to institute and maintain this suit, and that he is entitled to the relief which he prays if the proofs justify his allegations.

2. The principal question argued before us is the alleged usurious character of the transaction between Montgomery and the building association, by reason of which, it is alleged, the bond was rendered void which was secured by the deed of trust. But while it is true that the device of premiums, so called, which was used in this case, has often been employed by the astute managers of building associations to cloak usurious transactions, and the courts have not hesitated, and our own court, among others, has not hesitated, to declare these transactions void whenever it is shown that the device was, in fact, a scheme to evade the usury laws, yet we do not find that on its face the transaction here involved was a usurious transaction, and there is not sufficient evidence in the record to show that it was in fact of that character. The transactions of building associations, so called, can be carried on without usury, and it does not in all cases necessarily follow that the law against usury is violated if a larger sum is reserved to be paid for a loan or for an advance, whichever it may be called, than the principal and interest of the amount advanced. In the case of *Spain* v. *Hamilton* (*Spain* v. *Brent*) 1 Wall. 604, 17 L. ed. 619, and *Bedford* v. *Eastern Bldg. & L. Asso.* 181 U. S. 227, 45 L. ed. 834, 21 Sup. Ct. Rep. 597, it was held by the Supreme Court of the United States that when the promise to pay a sum above legal interest depends upon a contingency, and not upon any happening of a certain event, the loan is not usurious. Here the satisfaction of the loan would seem to have been made to depend upon a contingency, for the agreement would seem to have been that the bond should be regarded as satisfied whenever the stock in the name of Montgomery should, by payments by the holder and profits accruing from the operations of the association, become of the full value of $200 a share; and these profits, of course, were contingent.

But, as we have said, we need not determine this question, and we are not sure that there is sufficient evidence in the record to enable us to determine it. Nor does there appear to be any evidence upon which we would be enabled to determine the value of the so-called stock at any specified point of time. There

are statements that at certain dates it was worth a certain sum, but there are no means of verifying the accuracy of these statements. We think that the case can be decided upon a different ground.

Section 33 of the by-laws of the association, to which reference has already been had, provides that when shares of stock in a series shall each have reached the full value of $200 a share, or whenever loans to the full amount of every share of stock shall have been made, the shares shall all be paid off and the series shall be dissolved. Now, it is averred in the answer of the defendants that "all the nonborrowing stockholders in the 9th series," as well as in several other series, "have been paid off in full," and it is conceded in the statement annexed to the stipulation and made part of it, that Montgomery, with his eleven shares of stock, is the only remaining stockholder in that series. Now, the allegation that the nonborrowing stockholders have all been paid off in full necessarily implied, under the circumstances of this case, that their stock had fully matured and had reached the full value of $200 a share. Necessarily, therefore, the time had come under the by-law cited when all the shares should be paid off and the series dissolved. For the dues being the same for all, and the profits being proportionately divisible among all, the stock of all must mature at the same time. We cannot infer from anything in the record before us that there might be different dates of maturity for different shares of stock. The scheme of the association seems to demand that all the stock shall mature at the same time. Now, if this be so, it is not apparent how the stock of the nonborrowing stockholders could have fully matured and not that of the borrowing stockholders. The dues for both classes are the same, and the profits are equally applicable to both classes. The only difference between the two classes is that the nonborrowing class pays at the rate of $1 a month for each share of stock as dues, and the borrowing class, in addition to this payment of $1 a month as dues, pays also $1 a month as interest and 70 cents a month as premium. But this payment of $1.70 for interest and premium goes into the association as profit, not for the

benefit of the nonborrowing class alone, but for the equal benefit of all the stockholders, borrowers and nonborrowers alike. Were it otherwise, were this profit of $1.70 a month to go exclusively to the nonborrowing stockholders, we should have to hold that the whole scheme was illegal and the device a bold effort to evade the laws against usury.

The conclusion here indicated seems to be confirmed by the fact, which is apparent on the record and not contested by anyone, that, in the period of 125 months which elapsed between the date of the transaction between Montgomery and the association and July 31, 1903, when the complainant demanded a settlement and ceased his payments, the complainant had paid back to the association, on account of the loan to him, the aggregate sum of $3,712.50, in the way of dues, interest, and premium; or, if we exclude premiums, as being in the nature of a bonus, the sum of $2,750, in the way of dues and interest, —in either case considerably more than the $2,200 required to make the shares of stock of the full value set up by the by-laws.

We cannot understand how, under the scheme of this association, the shares of one man alone, the only stockholder remaining in the series, can have only reached the value of $170 a share, when all the other stockholders have received their shares in full.

3. If it be assumed, as we think it must here be assumed, that the complainant has overpaid the amount of his loan, whether such overpayment be the result of mistake or of usury in the transaction, it does not follow that he is entitled in this suit to recover back the amount of the overpayment. There is nothing to show that the directors, against whom a personal decree has been rendered, are or were stockholders of the association. There is nothing to show that they have any money of the association in their hands, derived from the transactions of the 9th series of stock, or from any other series, or from any other source. But apart from all this, it is very clear to us that the complainant is estopped from recovering the amount of his overpayment, at all events in this suit. He is bound by the by-laws of the association of which he became a member. He

is bound by the statements of the condition of the association which were made from time to time and to which he gave his tacit assent. Under these by-laws and in pursuance of these statements, the money paid into the association by him went to enhance the value of the stock of his associates and himself, and was in great part paid out to his associates when they were settled with and withdrew from the association. Plainly, therefore, it would be inequitable to hold the association as now constituted for money which was paid out to other persons with the knowledge and consent of the complainant.

It is our opinion that, while the complainant is entitled to have his property relieved from the deed of trust, and to have the bond given by Montgomery and the stock issued to him canceled, he is not here entitled to have a repayment to him of the money which he claims to have overpaid, if any such overpayment there was, and that the decree appealed from should be modified to that extent. So modified, that decree will be affirmed.

The cause will be remanded to the Supreme Court of the District, with directions to modify the decree rendered in the cause, in accordance with the opinion of this court, and for further proceedings therein according to law, if any such further proceedings are required in the premises, the costs of this court to be paid, one half by the appellants and one half by the appellees.        *Modified, and affirmed as modified.*