NATIONAL MUTUAL BUILDING & LOAN ASSOCIATION OF NEW YORK *v.* MARY E. PINKSTON ET AL.

ON MOTION.

1. SUPREME COURT. *Reargument. Additional assignments of error.*

When a cause has been remanded by the supreme court to its docket for reargument on one question, leave will not be given to raise other questions by additional assignments of error. *

ON THE MERITS.

2. BUILDING & LOAN ASSOCIATIONS. *Interest and usury. Statutory construction. Acts* 1886, *p.* 35.

The exception of building and loan associations from the provision of the act of 1886, that no person, bank, corporation or association of persons should thereafter demand or stipulate for a greater rate of interest than ten per centum, and repealing all acts creating corporations and their amendments, which authorized any greater charge or conflicted with the general statute limiting the rate of interest (code 1880, § 1141), did not operate as a grant of power to all associations, whether foreign or domestic, but was an exception in favor of domestic associations alone, the purpose of the act, as shown by legislative history and the declared policy of the state, being the prevention of ʳexcessive charges of interest by domestic corporations, other than building and loan associations, under authority of their repealable charters. *Calhoon, J., dissenting.*

FROM the chancery court of Lauderdale county.

HON. N. C. HILL, Chancellor.

The appellees were complainants and the appellant defendant in the court below.

The appellant was a building and loan association domiciled in the state of New York, and was lending money to its shareholders. It had no local boards or branch offices in Mississippi,

---

* After this case was argued and submitted it was by the court remanded to the docket for reargument on one question only; thereupon the appellant moved the court for leave to file additional assignments of error, seeking to bring into the case, for the first time, federal questions. This motion was denied. See opinion at the end of case.

but held all its funds and transacted its business at its office in New York; but it had a special agent with limited powers at Meridian, Miss., who was authorized to receive money from members of the association at Meridian, for their convenience, and to transmit the same to the office in New York, and with authority to receive applications for loans and transmit them to New York.   Loans were made by appellant company upon the following plan: The borrower was required to pledge to the association his shares of stock, and, in addition to monthly dues of 60 cents per share, was required to pay 6 per centum interest per annum, monthly, and 50 cents monthly on each share of stock of $100, for eight years.   Five-sixths of the amounts paid by shareholders as dues and all payments of interest, premiums and fines went into the loan fund, and was reinvested, and all profits derived from that source were apportioned to the shares in force, thus increasing the value of the shares.   The articles of association of the company provided that all payments should be made to the association at its New York office, and the bond and mortgage in this case also contained that provision.   Appellees, citizens of Meridian, Miss., applied to the local agent of appellant at Meridian for a loan of $2,000 in 1890, after they had subscribed for twenty shares of its stock of $100 each.   The application was filled out on printed blanks furnished by said local agent, delivered to him and by him sent to the New York office, where it was considered and the loan granted.   To secure the loan, appellees executed a mortgage on a lot in Meridian, and assigned their shares of stock to the company in the year 1890.   Appellees filed the bill in this case against appellant in the chancery court of Lauderdale county to cancel this contract and mortgage for fraud and usury.   The only question involved on the appeal, however, is whether the contract is usurious or not.   From a decree declaring the contract usurious, and canceling the contract and mortgage, as the principal had been paid, defendant appealed.

*Cochran & Bozeman* and *Mayes & Harris*, for appellant.

Does the act of 1896 apply to foreign building and loan associations as to the loans made by them to their shareholders in this state? The intent of the legislature as to this is to be determined from the act itself. *Rowan* v. *Odenheimer*, 5 Smed. & M., 49. Its words are to be taken in their ordinary and obvious signification. *Peller* v. *Peller*, 68 Miss., 141. And if they convey a definite meaning, which involves no absurdity or contradiction, then that meaning, apparent on the face of the instrument, is to be adopted, and no courts have a right to add or take from it. *Hawkins* v. *Carroll County*, 50 Miss., 735; 27 Am. & Eng. Enc. L., 298.

The judiciary cannot pass upon the expediency and fitness of rules which are exclusively committed to legislative discretion. Before the courts can declare a statute inoperative it must be shown to be violative of some provision of the constitution. *Rohrbacher* v. *City of Jackson*, 51 Miss., 735.

Looking then at the act itself, and interpreting its meaning according to the ordinary and natural import of the words used, the words, "except building and loan associations," must mean all building and loan associations, both foreign and domestic, because there is nothing in these words, or in the context, to indicate that the legislature intended to say domestic building and loan associations. To interpolate the word "domestic" would be an unwarranted addition to the statute.

Looking at the subject-matter of the act it will be noted that it is not a special or private or local act, nor an act on corporations, but a general law "in relation to the rate of interest in this state." Of course, the words, "interest in this state," cannot limit the application of the act to domestic corporations any more than to resident citizens. If this exception in favor of building and loan associations had been incorporated in the statute on corporations, it might with more plausibility be contended that it was intended to apply to corporations created under the laws of this state only, but it is a significant fact that

this exception was embodied in a general statute on the rate of interest, and this indicates that the legislature did not intend to limit its application to domestic corporations only. Section 2348, code 1892. And that the legislature understood the act of 1896 to apply to foreign as well as domestic building and loan associations is evident, from the fact that in enacting that section the exception of building and loan associations from the provisions of the section was, by express language, limited to domestic associations. It is to be presumed that the act of 1896 would have been made equally specific if such had been the legislative intent. It may aid in arriving at the legislative intent in the act of 1896 to consider the status of foreign corporations in this state at that time.

The only general statute then in force as to foreign corporations was § 1042, code 1880, the effect of which was to put foreign corporations on equal footing with domestic corporations as to their contracts and operations in this state; and that this was then the established rule of comity and public policy of this state in reference to foreign corporations; and it is, therefore, to be presumed that the legislature intended to make no distinction between domestic and foreign corporations of like kind, unless that intent be plainly evidenced in express terms. In the case of *Taylor* v. *Trust Co.*, 71 Miss., 694, the question was whether a foreign corporation could acquire and hold real estate under chapter 38, code 1880, as amended by Laws 1882, p. 50, granting the right to domestic corporations. And in passing upon this question, the court held that corporations created by one state may transact their business in another state in which, if the corporation was a domestic one, the business might there be lawfully conducted. See also to the same effect: *Williams* v. *Creswell*, 51 Miss., 817.

In *Santa Clara, etc.*, v. *Sullivan*, 116, Ill., 375, the supreme court of Illinois, in construing a statute similar to § 1042, code 1880, said: " By declaring that foreign corporations shall have no greater powers, there is a direct implication

that they shall have equal powers with domestic corporations of like character." Citing *Stevens* v. *Pratt*, 101 Ill., 217; 13 Am. & Eng. Enc. L. (2d ed.), 838, and note 2; 6 Thompson on Corporations, secs. 7882, 7889; *Hollis* v. *Srew Theo. Sem.*, etc., 95 N. Y., 166.

As to when the word " corporation " used in statutes applies to foreign corporations, see: *States* v. *Buchanan* (Wright), Ohio, 233; *Cross* v. *Armstrong*, 44 Ohio St., 616; *Andrews* v. *Ohio*, etc., *R. R.*, 14 Ind., 169; *Southern L. Ins. Co.* v. *Packer*, 17 N. Y., 51; *Stanhilber* v. *Insurance Co.*, 76 Wis., 285.

The rule of comity involved in the interpretation of this act of 1896 is characterized by Mr. Thompson in his admirable work on corporations, vol. 6, sec. 7884, as a comity of states, not of courts, as a legislative prerogative, by which the judiciary must be guided; and we submit to the court, in conclusion, that as there is nothing in the words of the act of 1886 itself which would indicate an intention on the part of the legislature to limit its meaning to domestic corporations, that the rule of comity and public policy of this state, evidenced by the statutes of this state, and particularly § 1042 of the code of 1880, the act of 1886 in question and the privilege tax acts of 1886, 1888, and 1890, in reference to building and loan associations, require that the court should give to the act of 1886 its natural and unrestricted meaning, and should hold that it governs the contracts of foreign building and loan associations made with its members residing in this state, while it was in force, and that the decree of the court below in this case should be reversed, and the contract held not to be usurious, even if it is to be construed by the laws of this state.

Section 1141, code 1880, is a penal statute, and it was not repealed, but was modified only by the act of 1886; then it should be construed as a penal statute, and so as to avoid the

forfeiture of interest, if it can be consistently done.    Webb on Usury, 258; *Porter* v. *Mount*, 45 Barb., 422.

*W. H. Hardy* and *Neville & Wilbourne,* for the appellees.

We submit that any construction of the act of 1886, approved March 13, 1886, being chapter 13 of the acts of 1886, which attributes to the legislature any other purpose and intention than to repeal all acts of the legislature theretofore passed granting to certain corporations and associations the privilege of charging a greater rate of interest than was allowed by the general law, except those acts which granted such privileges to building and loan associations, is not warranted by any rule for the construction of statutes. It will be well at the outset to state the constructions contended for by the appellant and appellees.    Appellant contends : (1) That said act was a re-enactment of section 1141 of the code of 1880, with an exception in favor of building and loan associations. (2) That sec. 1 of said act granted to all building and loan associations—foreign as well as domestic, and those not then in existence as well as those at that time in operation—the privilege of charging a greater rate of interest than 10 per centum per annum. Appellees contend: The sole purpose and intention of the legislature was to repeal all acts of the legislature then in force which granted to certain corporations and associations the privilege of charging a greater rate of interest than was allowed by the general law, except those acts incorporating building and loan associations, which granted to them such privilege.    It will not be denied that § 1141 of the code of 1880 prohibited all persons and corporations from charging a greater rate of interest than 10 per centum, and that as long as said section was in force no person or corporation could lawfully charge a greater rate of interest than 10 per centum without authority from the legislature.    Did the legislature of 1886 authorize appellant to charge more than 10 per centum interest ?    As it is a canon of interpretation of statutes that the legislative purpose and the object aimed at are to be borne in mind,

and that language susceptible of more than one construction is to receive that which will bring it into harmony with such object and purpose, rather than that which will tend to defeat it, let us seek to ascertain, if possible, the purpose of, and the object aimed at by, the legislature of 1886. Let us first locate the mischief or defect in the existing law which the act in question was intended to remedy. Was it the granting of the special privilege by the legislature to certain corporations of the right to charge a greater rate of interest than was allowed by the general law, or was it the absence from § 1141 of the code of 1880 of an exception in favor of building and loan associations? We submit that the mischief was the granting of special privileges, and not any defect in § 1141. It is a fact well known to all persons at all acquainted with the laws and constitutions of this state that from the organization of the state the people who have dictated the policy of the state, with the exception of about ten years after the close of the civil war, have always been opposed to the granting of special privileges. The first sections of the bill of rights in the constitutions of 1817 and 1832 are as follows: "That all free men, when they form a social compact, are equal in rights, and that no man, or set of men, are entitled to exclusive, separate public emoluments, or privileges, from the community, but in consideration of public service." It is also a well-known fact that the men who adopted the constitution of 1869, and made the laws during the reconstruction period, were in favor of the granting of special privileges, because it was a source of revenue. True to the motives that actuated them in all their actions, self-aggrandizement and contempt for all that was dear and sacred to the white people of the state, these men when they met in the constitutional convention, refused to adopt sec. 1 of the constitutions of 1817 and 1832, and adopted the following in its place: "All persons resident in this state, citizens of the United States, are hereby declared citizens of the state of Mississippi." The constitution of 1869 did not inhibit the granting of special privi-

leges by the legislature. The legislature subsequently granted to certain corporations the right to charge a higher rate of interest than was allowed by the general law. There is one fact that establishes beyond controversy that the legislature of 1886 did not understand this act to grant to building and loan associations the right to charge a greater rate of interest than was provided by § 1141 of the code of 1880. To this fact we call the court's attention. The charter of the Natchez Building & Loan Association did not grant to said association the power to charge a greater rate of interest than that fixed by said § 1141. The legislature of 1886 amended said charter by granting it such privilege. The act amending said charter was approved subsequent to the approval of the act of March 13. See acts 1886, at top of page 751. Now, if the act of March 13 granted to all building and loan associations the right to charge any rate of interest, why was it necessary to so amend the charter of the Natchez Building & Loan Association? It cannot, of course, be contended that there was any grant to building and loan associations of the right to charge more than 10 per centum interest. Nor can it be contended with more reason, that it was the purpose and intention of the author to repeal or re-enact § 1141 of the code of 1880. Will any one contend that the author of this bill intended to change the legal rate of interest on "all notes, accounts, judgments, and contracts" from 6 per centum to 10 per centum, or that it was his purpose to repeal that part of § 1141 of the code of 1880 relating to the forfeiture of interest in cases where a greater rate of interest than 10 per centum shall be charged? If appellant be correct in its contention that it was the intention and purpose of said act to repeal or re-enact § 1141, with an exception in favor of building and loan associations, then all notes, accounts, contracts and judgments made or rendered after the passage of said act bore 10 per centum interest per annum. The clause, "or which is in conflict with § 1141 of the code of 1880," refutes the contention of appellant that said act repealed or re-enacted § 1141.

Another fact which sustains our contention is that the repealing clause of this act does not repeal § 1141, but it does repeal "every provision of any act heretofore passed creating any corporation which authorizes any such corporation to take or receive more than 10 per centum interest per annum, or which is in conflict with § 1141 of the code of 1880." We have attempted to show that it was not the purpose and intention of the author of the bill to amend or repeal § 1141. Now, if that was not his purpose, what was it? There is but one answer, and that is to repeal all acts of the legislature which granted to any "person, corporation, or association of persons" the right to charge a greater rate of interest than 10 per centum. The bill passed the senate without amendment, but when it reached the house it was opposed by the friends of the building and loan associations, which had the right under their charters to charge a greater rate of interest than was allowed by the general law. Representative McCabe, of Warren county, offered an amendment, to wit, "except building and loan associations," after the word "persons," in the fourth line of the first section. See house journal, at bottom of page 443 and top of page 444. The bill passed the house as amended. Now, did the insertion of the words "except building and loan associations" entirely change the purpose of the bill? If the bill, before the amendment, was intended to repeal the acts of the legislature which granted to any person, corporation, or association of persons the right to charge more than 10 per centum interest, did the amendment so change the bill that its purpose after the amendment was to repeal or re-enact § 1141 of the code of 1880? We cannot believe that the able counsel for appellant will make any such contention. The very able attorneys for the building and loan association in the case of *Sullivan* v. *Association,* 70 Miss., 94, 12 So. Rep., 590, contended for the same construction of the act of 1886 that counsel for appellant are contending for in this case. Counsel for appellant will cite the court to the following from opinion of this court in the Sul-

livan case: "The utmost that this remarkable act can be said to do is to authorize building and loan associations to stipulate for and demand a greater rate of interest than 10 per centum per annum 'for any money advanced or loaned' by it." We call the court's attention to the fact that the charter of the Jackson Building & Loan Association, appellee in the Sullivan case, granted said association the power to charge a greater rate of interest than 10 per centum, and also to the fact that the only question in the Sullivan case was, did the act of 1886 authorize building and loan associations to charge interest on premiums? The statement of the court referred to was therefore dictum. Appellant contends that the act in question grants it the right to do a thing which the general public prohibits. Said act must, therefore, be construed strictly against the grant of such right. 23 Am. & Eng. Enc. Law (1st ed.), p. 398. Now, from what part of the act does appellant claim the grant? From the clause, "except building and loan associations." In other words, a grant is claimed from an exception. If the counsel for appellant be correct in their contention that the act of 1886 granted to building and loan associations the right to charge a greater rate of interest than allowed by § 1141 of the code of 1880, then we say that said act must be confined in its operation to building and loan associations organized under the laws of this state. It was so held by the supreme court of Alabama in the case of *Falls v. Building Co.,* 13 So., Rep., 25; 97 Ala., 417; 24 L. R. A., 174; 38 Am. St. Rep., 194.

Argued orally by *A. S. Bozeman* and *Edward Mayes,* for appellant, and by *George B. Neville* and *W. H. Hardy,* for appellees.

Whitfield, C. J., delivered the opinion of the court.

This case is controlled by the case of *Shannon v. Association,* 78 Miss., 955 (30 So. Rep., 51). The contention that the act

of 1886 (Laws, p. 35) applies to foreign building and loan associations is not maintainable. That act is as follows:

"An act to regulate the rate of interest in this State.

"SECTION 1. Be it enacted by the legislature of the state of Mississippi, that hereafter no person, bank, corporation or association of persons, except building and loan associations, shall demand or stipulate for a greater rate of interest than 10 per centum, per annum, for any money advanced or loaned, on any note, account, or other evidence of debt.

"SEC. 2. Be it further enacted, that every provision of any act heretofore passed, creating any corporation or amending any act creating any corporation, which authorizes any such corporation to take or receive more than 10 per centum, per annum, or which is in conflict with § 1141 of the code of 1880, is hereby repealed.

"SEC. 3. Be it further enacted, that this act take effect and be in force from and after its passage."

.We think it clearly appears from the history of the act—which can be gathered from the brief of counsel for appellee, which we direct to be published in full on this point—that said act is not an act merely amending § 1141 of the code of 1880, but is a repealing act. The history of the act shows that the legislature had, by special grants and charters to corporations—especially banking corporations—authorized such corporations to charge more than 10 per centum per annum interest, and it was the clear purpose of this act of March 13, 1886, as shown by sec. 2 of said act, to repeal all of these special grants in acts "heretofore passed," so as to abolish all special privileges by such previous acts granted in the matter of charging interest, and to put all persons and all corporations in this state on the same footing, applying the provisions of § 1141 of the code of 1880 to all alike. At the time of the passage of this act § 1141 of the code of 1880 provided the general law regulating the rate of interest in this state, and fixed the legal rate at 6 per centum, and authorized not more than 10 per centum to be charged by

contracts in writing. At this same time, however, various special acts authorized banks and other corporations, including building and loan associations, to charge more than 10 per centum—to charge varying rates; in some instances to charge any rate the corporation saw proper. Here was a manifest inharmony between the general law and the special statutes conferring these invidious special privileges, and the object of this act was to leave § 1141 in full force and effect by abrogating all these special acts in conflict therewith. Section 2 of the act plainly shows this to have been its clear purpose. That section repeals all these conflicting statutes, and thereby establishes uniformity as to rate as to all persons and all corporations within this state. There are many other considerations to which we will briefly advert, showing this to be the true construction.

1. The phraseology of every statute from Hutchinson's code to the code of 1892 shows—the object of such statutes being to provide a general rate of interest—that their phraseology is wholly unlike the phraseology of this act. The code of 1880, for instance, provides (§ 1141): "The legal rate of interest on all notes, accounts, judgments and contracts, shall be six per centum per annum; but contracts may be made, in writing, for the payment of a rate of interest as great as 10 per centum per annum. And if a greater rate of interest than 10 per centum shall be stipulated for, in any case, all interest shall be forfeited, and judgments and decrees, founded on any contract, shall bear interest after the rate of the debt on which such judgment or decree was rendered." This is a typical statute, as to this language, on this subject. It will be observed that sec. 1 of the act of 1886 provides what the legal rate of interest shall be, and that "hereafter no person, bank, corporation or association of persons shall demand or stipulate," etc. No reference is had in any previous general statute regulating the rate of interest to "banks, corporations, or associations of persons"; but at the time of the passage of this act certain "banks, corporations, and associa-

tions of persons" under the aforesaid special acts were charging more than 10 per centum interest, and sec. 1 was leveled directly at these, and provided that "hereafter" they could not charge more than 10 per centum. And sec. 2 expressly repeals the provisions in the said special acts authorizing them to charge more than 10 per centum. It would be quite an odd and unusual thing to find a special reference to "banks, corporations, and associations of persons" in a statute which is merely a general statute regulating the rate of interest; and the presence of this unusual phraseology is due to the fact that the "corporations, associations, and banks" named were then in existence, and then charging a rate which it intended to repeal, and thus put them on the same footing with the rest of the citizens of the state. The statute did not look towards foreign corporations. It looked within, to the persons and corporations domiciled within the state, with the view of abolishing invidious distinctions between such citizens of the state, natural or artificial, as to the right to charge interest. It was a domestic statute, intended to secure equality and uniformity in the matter of the rate of interest to be charged by citizens of this state.

2. The first section of the act provides no penalty for usury; and, if the view that it is a mere amendment to § 1141 of the code of 1880 be correct, then it follows that for a period of six years (from 1886 to 1892) there was no statute inflicting any penalty for usury in this State—a conclusion not to be supported; or that we would have to attribute to the legislature the folly, in dealing with so simple a subject-matter as the rate of interest, of prescribing that rate in the act of 1886, and yet fixing the penalty in § 1141 of the code of 1880. Surely, the legislature, if it had been dealing simply with the matter of regulating the rate of interest, would not have failed to do what had been done in every code from Hutchinson's down—provide a penalty for usury.

3. The first and second sections of the act of 1886 must be construed together, and the language of the second section

shows beyond controversy that it is dealing with corporations, "created" by acts of our legislature, which acts "authorize" such corporations to receive more than 10 per centum interest per annum. Of course, the acts referred to were acts "creating" corporations, etc., and "authorizing" corporations, etc. The Mississippi legislature could only "create" corporations domiciled within this state. Domestic corporations manifestly are the only ones to which this section refers. And it is a just inference that the first section is referring to those "persons, banks and corporations" domiciled within this state, and that the legislature was dealing with such persons and corporations only in the matter of interest; the object being to provide that "hereafter" —that is, after the passage of the act—persons and corporations domiciled within this state should not charge, etc. We think that the use of the word "hereafter" clearly implied that some "banks, corporations," etc., had theretofore been charging more than 10 per centum. And the use of the words "heretofore passed," in sec. 2, indicate likewise the purpose of the statute to be that by repealing all such acts "heretofore passed" there would "thereafter" be uniformity among all citizens as to the rate of interest to be charged. It was argued that this statute contains a grant to the building and loan associations to charge more than 10 per centum. It is obvious that this would involve us in holding that the substantive benefits of a grant passed by a mere exception in the statute, which is altogether unusual in legislation; besides, the contention is overthrown by the fact that building and loan associations in the state were authorized, prior to this act, to charge more than 10 per centum, to wit, the Vicksburg Building Association (Laws 1877, p. 223, sec. 4); the Greenville Building & Saving Association (Laws 1877, p. 224, sec. 4). And the history of this sec. 4, set forth in brief of counsel for appellees, shows that it had been brought forward from various special charters granting banks this special privilege, and applied, in 1877, to building and loan associations. It is therefore perfectly obvious that the words "except building and

loan associations," in sec. 1 of the act, were not intended to contain any new substantive grant to building and loan associations of a privilege they did not already have, but were rather intended—as the words indicate—to "except" building and loan associations from the repealing effect of sec. 2 of said act. It is shown by reference to the original copy of the act and the journals of the house and senate that these words "except building and loan associations" were not in the act as first framed, and that the sole purpose of their insertion was to "except" them from the sweeping repeal applied by sec. 2 of said act. As strengthening this view of the legislative purpose, the code of 1892, § 2348, expressly provides: "But this section shall not apply to a building and loan association domiciled in this state, dealing only with its members." It is necessary that the building and loan associations, to avail of this special privilege, must not only be domiciled within this state, but must deal alone with their members. These are conditions upon which the privilege to charge more than 10 per centum interest is granted. It might very well be that associations of the highly beneficial character possessed by true building and loan associations should be encouraged by the laws of this state, and that special privileges should be granted only to such building and loan associations as were chartered by our laws, subject to legislative control, domiciled within this state. There can be no reason, squaring with a wise public policy, in conferring any such privileges upon foreign building and loan associations, chartered by other states, deriving all their powers and privileges from the laws of other states, as interpreted by the courts of such states. The legislature, in the act of 1877, manifestly was dealing alone with the two domestic corporations named; and in 1886 it had in mind these two domestic corporations in writing this exception into sec. 1 of the act of 1886. They put the exception there with special reference to these then existing domestic building and loan associations. It was that class of building and loan associations which they could charter, over which they had power, and with

respect to which, therefore, they must surely have been legislating. In *Falls* v. *Building Co.,* 97 Ala., 423 (13 So. Rep., 25); 24 L. R. A., 174; 38 Am. St. Rep., 194, the supreme court of Alabama interpreted a similar statute precisely as we do—as referring alone to domestic building and loan associations—and the same doctrine is announced in the following authorities: In re Prime, 136 N. Y., 347; 32 N. E., 1091; 18 L. R. A., 713, where the court said: "A state statute granting powers and privileges to corporations, in the absence of plain indications to the contrary appearing on the face of the act, applies only to corporations created by the state;" and *Vanderpoel* v. *Gorman,* 140 N. Y., 563; 35 N. E., 932; 24 L. R. A., 548; 37 Am. St. Rep., 601, which was a case "in which a corporation created under the laws of New Jersey, doing business in the state of New York, made a general assignment for the benefit of all its creditors without preferences. An attachment was levied in the state of New York upon the property assigned, and the assignee brought suit to recover damages for the levy upon and sale of the property. The defendant in that suit claimed that the assignment was void on account of the provisions of a statute of the state, which, among other things, provided "that no corporation shall make any transfer or assignment to any person whatever in contemplation of its insolvency, and every such assignment is declared to be void." It was claimed that the foreign corporation was embraced in the general language of this statute. The court held that the law above quoted did not apply to foreign corporations. See 44 Cent. Law J., 118. We are therefore of opinion that the act of 1886 does not embrace foreign building and loan associations.

Calhoon, J., dissenting. The act under consideration is this:

"An act in relation to the rate of interest in this state.

"Section 1. Be it enacted by the legislature of the state of Mississippi, that hereafter no person, bank, corporation or asso-

ciation of persons, except building and loan associations, shall demand or stipulate for a greater rate of interest than 10 per centum per annum, for any money advanced or loaned on any note, account, or other evidence of debt.

"Sec. 2. Be it further enacted, that every provision of any act heretofore passed, creating any corporation, or amending any act creating any corporation, which antagonizes (authorizes) any such corporation to take or receive more than 10 per centum interest per anum, or which is in conflict with § 1141 of the code of 1880, is hereby repealed.

"Sec. 3. Be it further enacted, that this act take effect and be in force from and after its passage.

"Approved March 13, 1886." Laws 1886, ch. 13, p. 35.

The question now for answer is whether nonresident building and loan associations are included or excluded from the exceptions made by sec. 1. My view is, with the highest appreciation of the great ability of the opinion of the majority of the court, that such associations are included in the exception. It is incontrovertible that, if we had to deal only with the title of the act and sec. 1 of the act, all building and loan associations would be included, because then it would be a general act, pure and simple, applying to all persons and corporations, whether foreign or domestic, expressly excepting such associations. There would be no difference of opinion as to this, because in that case the scope would be too plain to require interpretation. The title is general, "In relation to the rate of interest in this state," and sec. 1 is general, applying to all persons, banks, corporations, and associations of persons, except building and loan associations. The effect is that none except building and loan associations shall either "demand or stipulate for" more than 10 per centum interest. Antecedently, the history of the usury laws is that Hutchinson's code, p. 641, § 2, provided that none should "take" more than the rate prescribed. This was varied by code 1857, p. 370, art. 1, to read, "stipulate for," which is followed in code 1871, § 2279, and in code 1880, § 1141. This is changed to

the words "demand or stipulate for" in sec. 1, acts 1886, above.
So, under that, the forfeiture under § 1141, code 1880, would
not be merely because of a stipulation for usury in the contract,
but even if the usury were demanded. This is clearly a statutory
amendment of § 1141, code 1880, and is clearly general, and
applies to all persons, etc., if standing alone. Section 2 of the
act can hardly be designed to restrict the generality of sec. 1. It
does not do so in terms. That is certain. In this view it must
be especialy noted that sec. 1 details separately persons, banks,
corporations, associations of persons, and building and loan as-
sociations, while sec. 2 simply repeals previous private acts as to
"corporations" only. What, then, is to be done with "persons,
banks and associations of persons," which may all be unincor-
porated, referred to in the first section? And what then be-
comes of the argument based on grants in private acts? Ju-
dicial changes in the unmistakable face meaning of statutes
by refined arguments on the probable legislative meaning is
liable to land us in Serbonian bogs. They are admissible only
where the meaning is doubtful. Building and loan associations
are not referred to in any general legislation prior to the act
of 1886. This act is silent as to the consequences of violating its
prohibitions, and so, necessarily, reference for its penalty must
be had to § 1141, code 1880. It follows that the legislative will
was to leave the penalty as prescribed in that code section,
which it amends in the particular of inserting the word "de-
mand," and in the particular of excepting building and loan
associations from its prohibition. The general law was that
all who stipulated for more than 10 per centum interest for-
feited all interest. Section 1 of the acts of 1886 excepts building
and loan associations, which implies that they may stipulate for
a greater rate. Section 2 relates alone to "corporations," and
plainly relates alone to domestic corporations. If sec. 1 relates
to and takes the place of § 1141, code 1880, except as to the
penal part, the result excepts building and loan associations
from the penalty. It could have no effect other than to except

these associations from those prohibited to take more than 10 per centum because all were prohibited by the code. That was the sole effect, if it conferred the right to take more than 10 per centum; and such seems manifestly to be its operation. Its operation on foreign as well as domestic building and loan associations seems equally evident. At the date of the act no law of this state regulated foreign building and loan associations or prescribed any terms of their doing business here. "Person, bank, corporation" embraced foreign as well as domestic building and loan associations, and they are mentioned by name in order to except them from the act, and only for that, as it seems to me. Five days after this act was passed, in a general statute the same legislature imposed a privilege tax on building and loan associations. Laws 1886, p. 20. This applies to foreign as well as domestic corporations, of course. How, then, can we limit the other act? It hardly comports with the magnanimity to be ascribed to the legislature to suppose that it meant to dig a pitfall to entrap the foreign companies into pouring their money into Mississippi to their own ruin. When our legislature meant to confine itself to domestic associations, it distinctly said so, as in § 2348, code 1892, and this is a pregnant fact in the construction of the act in hand.

The opinion of the court on the motion referred to in the foot note on page 468, and which, of course, was rendered before the foregoing opinions on the merits, is as follows:

WHITFIELD, C. J., delivered the opinion of the court on the motion.

This is a motion to file additional assignments of error in this case under these circumstances: The court heard this case at the last term of this court argued orally and on written briefs. There was no assignment of error presenting, or hinting at, even in the slightest degree, any federal question, nor was there the slightest reference to any federal question made in the

arguments, written or oral. The court reached a definite conclusion upon every proposition except one, and that one was whether the act of 1886, regulating interest in this state, embraced foreign, as well as domestic, building and loan associations; and on that specific proposition, and that proposition alone, the cause was remanded to the docket for reargument at this term of court. Counsel were invited to argue that specific proposition, and nothing else. In that attitude of the cause, counsel for appellant now come, and ask leave to file nine new assignments of error, all of which constitute an effort to inject into this case, under these circumstances, and at this late day, a federal question. No such question was ever presented to the court below. Not one of the matters in the nine assignments of error asked to be filed were ever called to the attention of the chancellor or of this court. The effort now is to ask this court to reverse the chancellor on assignments of error raising federal questions never presented to the chancellor, and which federal questions were never presented to this court, by any assignment of error, or by any argument, oral or written; and all this is, asked to be done after the court had decided the cause in all respects except the one indicated, and had remanded the case to the docket on the single proposition respecting the act of 1886.

The counsel misconceive. They must deal with the cause as it is. The case is on the docket for reargument on the single proposition specified, and is not there in any other sense, or for any other purpose; is not there at all, except as limited, to wit, for argument as to the said act of 1886. It ought to be obvious that the scope of the order remanding the case to the docket for reargument on the single proposition indicated necessarily excluded all else except said reargument.

<em>Motion denied.</em>