NATIONAL MUTUAL BUILDING & LOAN ASSOCIATION OF NEW YORK v. FRANK V. BRAHAN.*

80   407<br>f81   367

1. BUILDING AND LOAN ASSOCIATIONS.  *Usury.  Contract.  Law governing same.*

A contract under which a foreign building and loan association, having no office or general agent in Mississippi, lends money to a stockholder resident in Mississippi, secured by a deed of trust on lands there located, is in legal contemplation a Mississippi contract, and will be governed by the usury laws of that State when it appears that the association has special agents in various towns throughout the state with authority to solicit subscriptions for stock, take applications for loans and receive payments of dues, interest and premiums, although the terms of the contract provide that payments shall be made at the association's office in the foreign state.

2. AMENDMENTS.  *Federal question.  Practice.*

It is proper to strike from the files amendments of pleas and notices accompanying them, filed without leave, nearly two years after a cause is at issue, the object of which is merely to inject a federal question into the case and thereby secure the exercise of federal jurisdiction.

FROM the circuit court of Lauderdale county.

HON. GUION Q. HALL, Judge.

The appellee, Brahan, was plaintiff, and the appellant, National Mutual Building & Loan Association, etc., was defendant in the court below.

This suit was brought on July 7th, 1899, to recover about $2,200, paid by appellee to the appellant company in settlement of two loans, being the excess paid over and above the principal of the loans, and sued for as usurious interest.  The record shows that the appellant, the National Mutual Building & Loan Association, is a corporation chartered under the laws of the state of New York, and that it is a building and loan

---

*The appellant, National, etc., B. and L. Association, has, since this report was put in type, sued out a writ of error in this case to the United States Supreme Court.

association lending money to its shareholders only; that it had no office or general agent in the state of Mississippi, but did have special agents in Meridian, Miss., and elsewhere in the state, with limited powers, who had authority to solicit subscriptions for stock and to receive payments of dues, interest and premiums, to receive applications for loans, with instructions to transmit the moneys collected to the home office in New York, but had no authority to issue stock or to grant loans. In April, 1892, appellee, who was a citizen and resident of Meridian, Miss., subscribed for 25 shares of installment stock, and afterward applied for and obtained a loan of $2,500 on his 25 shares, and gave as security his bond and mortgage on certain property in Meridian, Miss., agreeing in his contract with the appellant company to pay monthly the dues on said stock and 6 per centum interest per annum on said loans and $12.50 premium on said loans until the maturity of said shares. It was provided in the articles of association and also in the bond and mortgage that all payment should be made to the association at its offices in New York city. Appellee to obtain this loan paid, by way of advance premium, $66.25, and paid on account of the loan as premium, interest and dues, $668,75, and in November, 1893, desiring to pay off the loan before maturity, he sent a draft on New York for $2,500 in full payment of said loan, retaining his 25 shares in the association. He continued to pay dues on these shares until October, 1894, when he withdrew five shares and received from the association their withdrawal value. In August, 1894, appellee obtained from appellant a second loan on his remaining 20 shares of stock of $2,000, and executed his bond and mortgage on certain property in Meridian, Miss., whereby he agreed to pay monthly dues on said stock and 6 per centum interest per annum on the loan, and a monthly premium of $10 until the maturity of said shares. Appellee paid on this second loan, by way of dues, interest, premiums and fines, $868, and in March, 1897, desiring to pay the loan before maturity, he

withdrew his 20 shares of stock and had the withdrawal value thereof, $649.70, credited on the loan, and sent the association at New York a draft on New York for $1,473.96 in full payment of the balance due. In July, 1897, appellee instituted this suit against the appellant association to recover all sums paid by him to the association on account of these two loans, in excess of the principal sum loaned. The defendant sought by amendments of the notice given under its plea of general issue to set up rights claimed under sec. 1, art. 4, and sec. 1, amendment 14 of the constitution of the United States, alleging that the contract was not usurious under the laws of New York and should be construed according to the laws of that state, where it was performable, etc. These amendments were filed without leave about two years after joinder of issue, but several months before trial, and on motion of the plaintiff were stricken from the files. The defendant, on the trial, asked for a peremptory instruction predicated of the grounds set up in the proposed amendment and because there had been a voluntary settlement between the parties. The court refused to so charge the jury, but held that the first loan made in May, 1892, under chap. 13, acts 1886, was not usurious, and so instructed the jury. It appeared that the appellee had overpaid the principal of the second loan to the amount of $667.96, and he recovered judgment for that amount. From this judgment the defendant prosecuted an appeal and the plaintiff a cross-appeal.

*A. S. Bozeman,* for appellant.

The first contract, that of May 21, 1892, was made under chap. 13 of the acts of 1886 of Mississippi, and except for the federal question involved in this appeal, its validity will be determined by the decision of this court in the case of *National Mutual Building & Loan Association* v. *M. E. Pinkston et al.,* now pending, and which has been fully argued.

The second contract, that of August 30, 1894, is identical with the contract that was construed by this court in the case of

*National Mutual B. & L. Assn.* v. *Wilson,* 78 Miss., 993, but I insist that this case is differentiated from the *Wilson case* in two important particulars.

1st. The Wilson loan was settled under protest, as the court states in the opinion in that case, while both loans in this case were settled voluntarily and at the instance of Brahan and with the full knowledge of the facts, the said Brahan being an attorney at law.

2d. And in the second place, the federal question was not involved in the *Wilson case.* The association did not rely upon the provisions of the Constitution of the United States in that case, either in its pleadings or its proof, or in the argument or briefs of counsel. But in this case the effect of the provisions of the constitution of the United States, and particularly of the fourteenth amendment thereof, is necessarily involved in the determination of this suit, it being insisted by the association in its proposed amendment of the notice under the general issue, and subsequently in its motion for a peremptory instruction that under the provisions of the constitution of the United States, and particularly under the fourteenth amendment thereof, the contracts were both valid and not usurious.

With all deference to this honorable court and to its decision in the *Wilson case,* I submit:

1. That both contracts in this case were made in the state of New York. It required the meeting of the minds of the two parties to make the contract. This was consummated when Brahan's written applications for the loans were granted, and this was done at the office of the association in New York by its executive committee.

2. I submit, in the second place, that the contract is, by its terms, performable in the state of New York, and is therefore to be governed by the laws of the state of New York, under the rules laid down in *Miller* v. *Tiffany,* 1 Wal., 695; *Andrews* v. *Ponds,* 13 Pet. 65.

The courts of the various states conflict in their decisions as

to whether or not they will apply these rules to the contract of a foreign building and loan association, as in this case. The various decisions were cited and discussed by counsel in their briefs in the cases of *Association* v. *Wilson* and *Association* v. *Pinkston,* and this court in its decision of the *Wilson case* preferred to follow the courts of North Carolina, Texas and Kentucky, rather than the courts of Alabama, Arkansas, South Carolina, Tennessee, Virginia, West Virginia and Pennsylvania and the United States courts. Since the decision of this court in the *Shannon* and *Wilson cases,* the supreme court of the United States, the highest authority in this country, has had before it the same question in the case of *Bedford* v. *Eastern Building & Loan Association of New York,* and on April 22, 1901, rendered a unanimous decision following the United States courts and the state courts of Alabama, Arkansas, Tennessee, South Carolina, Virginia, West Virginia and Pennsylvania, and holding that under facts practically similar to the facts in this case the contract was to be construed by the laws of the state of New York, where, by its terms, it was performable; and this notwithstanding the fact that the borrower was permitted to make payments to a special agent in Memphis, Tenn., where he resided, and where the preliminary negotiations for the loan took place and where the property mortgaged was situated. See *Bedford* v. *Eastern B. & L. Assn. of N. Y.,* 21 Sup. Ct. Rep., 597; 14 A. & E. Corporation Cases, 686. See also the certified copy of the opinion filed herewith as a part of this brief. The facts in this case will be found fully stated in 88 Fed. Rep., 7. · In view of this decision of this court of last resort and highest authority, I respectfully submit that the court should hold in the case at bar that the contracts are New York contracts.

3. I submit in the third place that the uncontradicted evidence shows that a voluntary settlement was made of both of the loans in this case by Brahan, the plaintiff below. There is no evidence to show that he was even requested to make these

settlements, but it fully appears that the settlements were made at his own instance and for his own purpose, and with full knowledge of the facts. In this settlement Brahan received his part of the profits of the association that were made up of payments made by other borrowers under contracts identical with his own, which payments were usurious if the payments made by Brahan were usurious. He took as his own part of the profits arising from the payments made by other borrowers, and still holds it, and I submit that under the rule laid down by this court in the case of *Natchez B. & L. Assn.* v. *Shields,* 71 Miss., 630, that Brahan is estopped to maintain this suit. See also *Cox* v. *B. & L. Assn.,* 50 S. W. Rep., 662, (Tenn.).

This is a beneficent rule and the facts in this case afford an opportunity where it should be applied.

4. I submit that the court erred in refusing to allow the defendant below to amend its notice under the general issue, so as to set up its rights under the constitution of the United States. The laws of this state are liberal in permitting amendments to be made at all times, so as to bring the merits of a controversy fairly to trial. The amendments were filed, the first one ten months before the trial of the cause, and the second one four months before the trial of the cause, and it was not possible for the plaintiff below to be prejudiced by the amendments except in so far as it gave the defendant below the benefit of the provisions of the constitution of the United States. Surely it cannot be contended that a litigant may be deprived of his rights under the constitution of the United States by the arbitrary ruling of the lower courts. I submit that the court erred in refusing to permit defendant to amend its notice under the general issue, as proposed.

5. I submit, in the fifth place, that both of the contracts in this case are valid and binding under the provisions of the constitution of the United States set up in the pleadings, and particularly under the provisions of sec. 1 of the fourteenth amendment thereof. "No state shall make or enforce any law

which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of health, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In the case of *Allguyer* v. *State of Louisiana,* 165 U. S., 578, which was an appeal to the supreme court of the United States from the supreme court of the state of Louisiana, it is held that the "liberty" of the citizen guaranteed by the fourteenth amendment includes the liberty to make contracts with a citizen of another state, and I submit that under the rule laid down in the *Allguyer case,* Brahan had the right to make the contracts in question with the appellant association, a New York corporation, and that the association is entitled under the provisions of the fourteenth amendment to have the contracts upheld as valid and binding contracts and to have them construed by the laws of the state of New York. The state of Louisiana recovered a fine of $1,000 against Allguyer for a violation of a Louisiana statute to prevent persons from dealing with marine insurance companies that had not complied with such statute; Allguyer having while in the state of Louisiana insured certain property then situated in Louisiana with the insurance company domiciled in New York, that had not complied with the provisions of the Louisiana statute. Allguyer effected the insurance by writing a letter in the state of Louisiana addressed to the insurance company in New York and mailing it in Louisiana, and the supreme court of Louisiana said that the act of writing within that state the letter of notification was an act therein done to effect insurance on property then in the state in a marine insurance company which had not complied with its laws, and that such act was therefore prohibited by the statute; and the supreme court of the United States, in commenting upon this, says: "As so construed, we think the statute is a violation of the fourteenth amendment of the federal constitution, in that it deprives the defendants of their

liberty without due process of law. The statute which forbids such act does not become due process of law, because it is inconsistent with the provisions of the constitution of the Union. The liberty mentioned in the amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." . . . "The mere fact that a citizen may be within the limits of a particular state does not prevent his making a contract outside its limits while he, himself, remains within it. The contract in this case was thus made, which was a valid contract made outside of the state, to be performed outside of the state, although the subject was property temporarily within the state. As the contract was valid in the place where made and where it was to be performed, the party to the contract, upon whom is devolved the right of duty to send the notification in order that the insurance provided for by the contract may attach to the property specified in the shipment mentioned in the notice, must have the liberty to do that act and to give the notification within the limits of the state, any provision of the state statute to the contrary notwithstanding."

Judge Hammond, in the case of *Eastern B. & L. Assn.* v. *Bedford,* 88 Fed. Rep., 7, cites and analyzes the decision in the *Allguyer case,* and applies it to the case like the case at bar, and holds that the *Allguyer case* clearly establishes the right of a citizen of one state to make the contract by correspondence payable in another state and binds and controls all state courts on that point.

On appeal from the decision of Judge Hammond the supreme court of the United States decided three points:

1. That the state court not pass a law impairing the obligation of the contract to make a loan, which contract had been previously made by application of the borrower for a loan and agreement of the association to make the loan.

2. That the loan in that case was not usurious because of the element of uncertainty in the contract, and,

3. That the contract was to be governed by the laws of the state of New York, where it was made performable.

I submit, therefore, that it has been conclusively settled by the supreme court of the United States in the *Allguyer case* and the *Bedford case* that under the provisions of the fourteenth amendment to the constitution of the United States the parties in the case at bar had the right to make the contracts as they did make them, and particularly to make them payable in the state of New York, and that under said amendment of the constitution the appellant has the right to have said contracts construed and interpreted according to the laws of the state of New York, under which it is conceded that they are valid. I submit, therefore, in conclusion, that the judgment of the court below was proper in holding that the contract of May 21, 1892, was valid and not usurious; but that the court below erred in overruling the motion of the defendant below for a peremptory instruction and in refusing the instruction and in holding that the contract of August 30, 1894, was usurious.

*F. V. Brahan,* for the appellee.

1. As to the question of usury in the first contract, we rest this case on the briefs in the case of *Mutual Building & Loan Association* v. *Pinkston,* lately submitted in this court (79 Miss., 468), in which the act of 1886 is fully discussed.

2. Under the late decisions of this court there can be no doubt that the contract of August, 1894, was usurious, and that the contract of May, 1892, was also usurious, unless the association can find shelter under the act of 1886. *Sokoloski* v.

*New South B. & L. Assn.,* 77 Miss., 155; *Crofton* v. *New South B. & L. Assn., Ib.,* 166; *National Mutual B. & L. Assn.* v. *Wilson,* 78 Miss., 993.

3. The amendments of the notice under the general issue were properly stricken out. On the subject of allowing the defenses set up therein see 3 and 12 Am. & Eng. Enc. Law (1st ed.), Black on Const. Law, 3.

WHITFIELD, C. J., delivered the opinion of the court.

This case is controlled on the direct appeal, as to the loan made under the code of 1892, by the cases of *National Building & Loan Association* v. *Wilson,* 78 Miss., 993 (30 South., 56); *Shannon* v. *Georgia State Building & Loan Association,* 78 Miss., 955 (30 South., 51), and the authorities therein cited; and *Association* v. *Burch* (May, 1900), 124 Mich., at p. 63 (82 N. W., 839), wherein this very appellant was appellant, and the same conclusion reached by us in the first two cases above, was reached by the supreme court of Michigan, the court saying: "It is said the contract is a New York contract, and must be governed by the New York law, and for that reason can be enforced. We do not think it at all clear that this is a New York contract, or that it was so understood to be when it was made. While, by the terms of the mortgage the loan was to be paid in New York, it was expected the money would be paid to the treasurer of the local branch at Muskegon, and most of it was paid to him." And emphatically to the same effect are the very thoroughly considered cases of *Association* v. *Stanley,* 38 Or., 340 (63 Pac., 489—decided in 1901), and *Association* v. *Kidder,* 9 Kan. App., 390 (58 Pac., 798— decided in 1899), and *Association* v. *Atkinson,* 20 Tex. Civ. App., 516 (50 S. W., 170). In *Stanley's case,* at pages 340, 341, 38 Or., p. 495, 63 Pac., Judge Wolverton, in the course of a masterly opinion, says with great power: "The plaintiff contends, however, that the agreement must be treated as a Washington contract, and therefore should be construed with

reference to the usury laws of that state, and incidentally, that the transaction of making the loan, and taking a note payable at Seattle, Wash., and a mortgage upon lands in Oregon, to secure its payment, was not doing business within the state. It is strange reasoning to insist, on the one hand, that, in order to enable the plaintiff to sue in our courts, it has complied with the law with that particularity which will enable it to do business in the state, and yet, when it is suggested that it has violated the laws of usury here by a transaction consummated under the same authority that authorizes the suit, to insist that it has not done business within the state. The very purpose of the act is to enable those associations having their domiciles in other states to do and transact business and sue and be sued here, and it ought to be alike effective under all conditions. When they come here under the statute, and have the license of the secretary of state to do business here, they become *pro hac vice* domestic corporations, and must operate as if actually domiciled in the state. They submit and render themselves amenable to the laws of the state, which must be taken to govern all their transactions entered into and consummated therein. Our own citizens would not be permitted to make contracts here payable in another state, and then insist upon having them construed here according to the laws of such state; and it does not seem consistent with principle and reason that a foreign corporation, securing citizenship in this state for the purpose of promoting its business, can insist upon making its contracts payable elsewhere and then invoke the authority and process of our courts to enforce them according to laws other than our own. If such were to be recognized as good law it would in many instances give foreign corporations, although domiciled in this state, advantages over those organized under its laws and having their principal place of business here. But the transaction, under the conditions attending it, must be re-garded as doing business within this state. *Bank* v. *Page*, 6 Or., 431; *Hacheny* v. *Leary*, 12 Or., 40 (7 Pac., 329); *Manu-*

*facturing Co.* v. *Ferguson,* 113 U. S., 727 (5 Sup. Ct., 739, 28 L. Ed., 1137). The contract was made in Oregon, and must be construed and enforced according to our laws. The application for stock and the loan was made in Oregon, to and by an association domiciled and doing business therein, through a resident solicitor. The mortgage was given upon an Oregon farm, and was executed and acknowledged here. The money was used here, and this suit was instituted in the county in which the mortgage premises are situated, as contemplated by the association when it acquired the license to do business in the state. All this, notwithstanding the mortgage stipulation to the effect that it is a Washington contract, clearly shows its Oregon nativity, and it is therefore solvable by the laws thereof. *Meroney* v. *Association,* 116 N. C., 882 (21 S. E., 924, 47 Am. St. Rep., 841); *Martin* v. *Johnson,* 84 Ga., 481 (10 S. E., 1092, 8 L. R. A., 170); *Dickinson* v. *Edwards,* 77 N. Y., 573 (33 Am. Rep., 671); *Jackson* v. *Mortgage Co.,* 88 Ga., 756 (15 S. E., 812)."

All this is in exact line with what we held in *Shannon's* and *Wilson's cases* as to what constituted "doing business" in a state, and as to the clear duty of the court to go behind the paper recital to the actual facts of the case as to the board being the agent of the company and the money being really payable here. In *Kidder's case* the whole contract was made by correspondence through the mail—there was not only no local board, but not even an agent of the corporation in Kansas, and yet the court said: "These contracts were entered into by correspondence; they were drawn by plaintiff in New York and sent to defendants at Scandia, who executed and returned them to the plaintiff. All payments were to be made to the secretary of the association at Geneva, N. Y. . . . The contract for the purchase of stock and for the loan of money was made by correspondence between Kidder, in the state of Kansas, and the association, in New York; the place of performance as fixed was at the office of the association in the

latter state. This contract, so far as its language could control, was entered into with reference to the laws of the state of New York, and was to be there performed; that is, the purchase price of the stock and the principal and interest upon the loan were to be paid at the association's office. However, the mortgage could only be enforced in the state of Kansas. A contract usually is entered into with reference to the laws of the state or country where it is made, or to be performed; but where a contract must be enforced in a particular place, the laws of that state may apply to such provisions of the contract as are in conflict with the laws thereof. In the foreclosure of a real estate mortgage the usury law of the state in which the land is situated will govern, although payment of the loan in another state is provided for by the terms of the contract. The contract amounts to an evasion of the usury laws, and it cannot be enforced. . . . It seems, however, that while the association desires to claim all the benefits of a New York contract as an abstract proposition, it desires the courts of this state to enforce the same as a Kansas contract, for the purpose of enabling it to secure the foreclosure of its lien upon Kansas soil for the payment of a usurious contract. This contract made as it was by correspondence, with a view of being enforced in this state, is a Kansas contract."

This goes far beyond our holding in the *Shannon* and *Wilson cases.* In *Atkinson's case* in 20 Tex. Civ. App., 516 (50 S. W., 170—decided in 1899), the court holds the local boards the agents of the company, and the notes Texas contracts, on the evidence, notwithstanding recitals to the contrary in the contract. It looked, as we did, to the actual facts. We add these very recent and well-considered cases to those cited in *Shannon's* and *Wilson's cases.* They support fully in every particular the law as announced by us in those cases. And we call special attention to the fact that in *Stanley's case* the cases of *Allgeyer* v. *Louisiana,* 165 U. S., 578 (17 Sup. Ct., 427; 41 L. Ed., 832), and *Association* v. *Bedford* (C. C.),

88 Fed., 7, were cited and relied on, without avail. See brief of counsel, 38 Or., 326. The judgment on the direct appeal is therefore affirmed.

On the cross-appeal, as to the loan made under the act of 1886, the case of this same appellant v. *Pinkston* controls. 79 Miss., 468 (30 South., 692). The judgment on the cross-appeal is therefore reversed, and the cause as to that loan remanded, to be proceeded with in accordance with the opinion this day delivered in *Association* v. *Pinkston,* 31 South., 834. We desire, in passing upon the merits of the case, to say for the satisfaction of learned counsel for appellant, that we have both in this case and in the case of *Shannon* v. *Georgia State Building & Loan Association* and *National Building & Loan Association* v. *Wilson*—both reported in 78 Miss., 30 South.—carefully considered the opinion of Judge Hammond in (C. C.) 88 Fed., 7, and Judge McKenna in *Bedford* v. *Association,* 181 U. S., 227 (21 Sup. Ct., 597, 45 L. Ed., 834). The differences between that case and this and the *Shannon* and *Wilson cases,* are great and obvious. The statutes of this state construed by us in *Shannon's case* and *Wilson's case* are wholly different from the act of the legislature of Tennessee passed March 26, 1891, and from chap. 2 of acts of 1891, Laws of Tennessee, and the facts in this and *Shannon's case* and *Wilson's case* are very much stronger for appellee than in *Bedford's case.* The precise question for decision in *Bedford's case* is thus stated in *Bedford* v. *Association,* 181 U. S., at p. 237 (21 Sup. Ct., 600, 45 L. Ed., 834); the assignments of error present the question of the enforceability of the notes and mortgages under the Tennessee law, "or as the question may be put, whether there was a contract between the parties, a right in one, and an obligation in the other, arising from a consideration given and received; mutual covenants by which each party acquired the right to that which the other promised or engaged to do, and whether the laws of Tennessee as interpreted by its courts impaired that right." The question is again stated by the court at

p. 240, 181 U. S.; p. 601, 21 Sup. Ct., 45 L. Ed., 834, thus: "The statutes of Tennessee relied on as a defense were passed March 26, 1891, and to repeat, the question is, did the subscription to the stock of the association, its issuance and the application for a loan in pursuance of it, constitute a contract which was inviolable by the state legislature? We think the answer should be in the affirmative." The facts were shown to be, so far as decision is concerned, that Bedford made his application for a loan on the 20th of March, 1891, and that the business of the association in Tennessee, which business it had been there carrying on was lawful at that time and up to March 26, 1891, when the legislature of the state of Tennessee passed chap. 122, sec. 2, of the acts of 1891, prescribing the terms and conditions on which foreign corporations might do business in that state; that on the same day the legislature passed chap. 2 of the acts of 1891 providing certain conditions, compliance with which the legislature made a condition precedent to the right of foreign building and loan associations to do business in that state, one of the conditions being that such foreign building and loan associations should "deposit and continually thereafter keep deposited, in trust for all of its members and creditors, with some responsible trust company, or with some state officer of this or some other state of the United States, mortgages or other securities received by it in the usual course of its business amounting to not less than $25,000 nor more than $50,000, at the discretion of the state treasurer." The facts in the case show, as is clearly pointed out by Mr. Justice McKenna, that the contract was made and completed by Bedford's subscribing to the stock of the association, prior to the passage of both these statutes. And the facts further show that the court of chancery appeals of Tennessee in *Loan Co.* v. *Miller,* 47 S. W., 17, which was affirmed on appeal by the supreme court of the state of Tennessee December 18, 1897 (and it will be specially noted, without written opinion), held that a contract, similar to the contract in *Bedford's case,* was a New

York contract. This had also been held by the supreme court of Tennessee in *Pioneer Savings & Loan Co.* v. *Cannon,* 96 Tenn., 603 (36 S. W., 386; 33 L. R. A., 112; 54 Am. St. Rep., 858), without any citation of authorities. Note that it seems to have been conceded in that case that the contract was a Minnesota contract, and no point was made as to that. The facts, however, in *Loan Co.* v. *Cannon* are very different indeed from the facts in *Bedford's case,* the facts in *Miller's case* and the facts in this case.

The precise point decided therefore in *Bedford's case* in 181 U. S. (21 Sup. Ct., 45 L. Ed.), was simply and only this, that inasmuch as the contract of loan had been fully made prior to the passage of the two Tennessee statutes involved, a reciprocal fixed and vested right on Bedford's part to demand the loan and on the company's part to require him to complete the loan, had attached prior to the passage of the acts—the obligation of which contract so made prior to these statutes it was not within the power of the state of Tennessee, by legislation, to impair. That, that precisely, and nothing more or less than that, was what was decided in *Bedford's case,* and was all that was decided in *Bedford's case.* Any observations of the court in 88 Fed. Rep., 7, beyond what was thus decided, were not necessary to decision and were mere *obiter dicta.* We understand *Bedford's case* as decided in 181 U. S. (21 Sup. Ct., 45 L. Ed.) to be in perfect harmony with our decision in *Shannon's case* and *Wilson's case,* 78 Miss., 30 So. We put the decision in *Shannon's case* as follows (see p. 964, 78 Miss., and p. 52, 30 So.) : "The chief point of contention is whether this is a Georgia or a Mississippi contract. It is true the notes were payable in Georgia, but the mortgage was on land in Mississippi, and the debtor lived in Mississippi, where alone the mortgage could have been enforced. All the payments through a series of years were actually made in Mississippi, instead of Georgia, to the local treasurer here, and it is manifest that it was intended they should be made here. This foreign corporation had the power to

organize local boards throughout Georgia and other states. It did organize a local board, thoroughly officered, at Ellisville, in this state, and to the local secretary and treasurer of this board all payments were made by the appellant and his vendor and by other members of this association through a series of years. It is obvious that this foreign corporation has thus localized its Mississippi business within the state of Mississippi. It is not a case of a non-resident money-lender, or a foreign corporation, in a few isolated cases dealing with our citizens and taking notes payable in the state of the domicile of such person or corporation. It is a case of a localization within this state of a large business done by a foreign corporation on the security. of mortgages on land in this state, the payments to be made to the secretary and treasurer of their respective local boards scattered throughout the state. Wherever, under circumstances, such as these, the foreign corporation, thus localizing its business within this state, has the payment made to the secretary or treasurer of a local board, the real intention of the parties is that the payments shall be made in this state, and the only purpose of reciting the contrary in the notes is to evade the usury laws of this state. The contract is a Mississippi contract according to the real facts and the real intention of the parties. Courts look through all disguises to the real case made by the actual facts." And again on p. 970, 78 Miss., p. 54, 30 South.: "And it is immaterial whether the foreign corporation is doing business under a license here or has, without such license, localized its business and domesticated itself here as to such business. And the laws of 1890, p. 10, places 'each branch office' and 'each agency' on the same footing exactly, treating each as a separate and distinct building and loan association, and taxes each as such. The general doctrine is, of course, well settled that the law of a place where the contract is to be performed governs the contract, and the presumption that this contract was to be performed according to the laws of Georgia, simply because the notes were

payable in Georgia, is, at last, nothing but a mere presumption to that effect, subject to be overcome by proof that, in truth and in fact, they intended the money to be paid in Mississippi. When all there is, in a case like this, to show that the intention was to perform the contract in a foreign state, is a mere specious paper recital in the notes, and over against this, and contrary to this, are all the other facts in the case, and the whole course of dealing between the parties, it would be an abdication of common sense on the part of any court to find the real intention of the parties in the paper recital instead of in the real facts of the case. It must be remembered that the state has the power to prescribe the terms on which foreign corporations may do business. It is declared in § 849 of the code of 1892 (last clause), 'Such foreign corporations shall not do or commit any act in this state contrary to the laws or policy thereof, and shall not be allowed to recover on any contract made in violation of law or public policy.' This is the plain mandate of our law, which must be rigidly enforced by the courts. And the code elsewhere provides that (§ 2348) domestic building and loan associations are excluded from the operation of the usury laws, but foreign building and loan associations are subject to them; and to enforce this public policy, thus declared by the statute, is not to give extra-territorial operation to our statutes. On the contrary, this corporation has come into the state, localized its business here, through local boards scattered all over the state, and must submit such business thus localized to the operation of the laws of the state. To hold otherwise would operate the grossest injustice to our citizens and would virtually abrogate our statutes against usury." And again on p. 974, 78 Miss., p. 55, 30 South.: "Foreign corporations wishing to do business with our citizens and localizing that business within our state through local boards, must comply with the laws of this state. They cannot, under such circumstances, enforce here stipulations in contracts allowed by the law of the state which created them if

these stipulations violate our laws or public policy.   Such laws of such foreign states can have, *ex proprio vigore,* no extraterritorial effect, and it is not competent for a foreign corporation, whose business has been localized in this state, or the borrower—or both—to abrogate by attempted contract stipulations —whose purpose is to evade our laws against usury—the laws of this state on that subject.   This holding in no way interferes with the right of a foreign corporation whose business has not been localized here, to make contracts with borrowers, to be governed by the laws of the state of their domicile, if there be no purpose therein to evade the usury laws of this state.   Such liberty of contracting, exercised in good faith, is not herein interferred with.   The authorities cited to that point by counsel for appellee are not pertinent to cases like the one before us. All the cases are admirably collected in a note to *Bank* v. *Cook* (Ark.), 46 Am. St. Rep., 171, s.c., 30 S. W., 35; 29 L. R. A., 761.   In that note the learned editor points out, on page 202, the distinction to be observed, saying: 'The proper answer to this argument is, that mere shams and evasions are not permitted to counteract and annul the law, and where it appears that the purpose of the parties in making the obligation payable in another state was to evade the laws against usury of the state in which it was executed, it will be regarded as infected with usury.' "   And in that decision we supported our conclusion by authorities drawn from many states to which we again refer, and which we again approve.   Now it is perfectly plain to the most casual observation that the point on which the *Shannon case* hinged, which was supported by the facts in that case, and by the authorities cited, was not even presented to the court—either to the judge of the circuit court of the United States in 88 Fed., or to the United States supreme court in 181 U. S., 21 Sup. Ct., 45 L. Ed., *supra.*   There was not a suggestion of this point in that case as presented either in the lower court or the supreme court, nor was any such point presented, in any manner, in any of the cases previously cited

from the supreme court of Tennessee. In other words, the facts in *Shannon's case,* a Mississippi case, presented a ground for decision under the statutes of this state not even hinted at in *Bedford's case,* or *Miller's case,* or *Cannon's case,* in 99 Tenn., 344 (41 S. W., 1054), or the other *Cannon* case in 96 Tenn. (36 S. W., 33 L. R. A., 54 Am. St. Rep.); and that ground of decision was that the foreign corporation had many local boards scattered throughout this state, which local boards were the agents manifestly of the corporation, through which boards the corporation had been for years transacting business in this state, making large numbers of loans, involving large sums of money, and had thus localized its business here, and had domesticated itself as to that business within this state. The very converse of this, it clearly appears, was true in *Bedford's case.* Mr. Justice McKenna takes pains to point out, at p. 236, 181 U. S., p. 600, 21 Sup. Ct., 45 L. Ed., 834, that after the passage of the act of March 26, 1891, the loan company transacted no further business in Tennessee (no new business), confining itself strictly—so as to avoid the statute—to completing loans contracted prior to the passage of these acts, and at p. 241, 181 U. S., p. 602, 21 Sup. Ct., 45 L. Ed., 834, he says: "It might indeed have the right to decline any condition and retire from the state, and from all it had the option to retire from. But it could not retire from the execution of its contracts. It contracted with Bedford to make him a loan, if it had the means in its treasury and his security was good. The state could not effect that obligation nor impair it. . . . We recognize the power of the state to impose conditions upon foreign corporations doing business in the state. We have affirmed the existence of that power many times, but manifestly it cannot be exercised to discharge the citizens of the state from their contract obligations." Language could not more plainly say that the only point decided in the case was that, inasmuch as Bedford and the company had already completed their contract, before these acts were passed, the legisla-

ture could not by a subsequent act impair the contract; there is not the lightest suggestion in the opinion of the court that the facts on which the opinion in the *Shannon case* was based was ever presented to the court. Again, the supreme court of the United States very naturally followed the supreme court of Tennessee as to there being no usury in the Bedford contract, since that court in the light of the contract in the Pioneer case had held that a similar contract made in Tennessee, payable in Minnesota, was a Minnesota contract, and had also held the same in the *Miller case, supra.* What the Tennessee supreme court thus held in construction of the contracts in those cases and also in construction of their usury statutes, the supreme court of the United States properly followed, under the well-settled doctrine that that court will always follow the interpretation put upon state statutes—merely local laws—by the supreme court of the state whose statutes they are dealing with. Under our statutes, which are materially different—as is shown in *Shannon's case* from the statutes of Tennessee, and under the facts in this case and *Shannon's case,* and *Wilson's case*—which in all these cases are vitally different from the facts in *Bedford's case* we hold the contracts are usurious, and in so holding we are doing nothing more or less than construing our own statutes as to usury, and our statutes imposing privilege taxes on "each branch office" and "each agency" of a foreign building and loan association. See Laws 1890, p. 10; *Shannon's case,* 78 Miss., 970 (30 South., 51). Furthermore, it is made perfectly plain by Mr. Justice McKenna that the supreme court of Tennessee in *Cannon's case,* 99 Tenn., 41 S. W., and in *Miller's case* (Tenn. Ch. App.), 47 S. W., 17, held that the contracts were not Tennessee contracts, but that they were nevertheless void, because the foreign corporations had not complied with the terms and conditions prescribed by the legislature of Tennessee, upon compliance with which alone they were authorized to do business in that state. The supreme court of the United States,

therefore, in the *Bedford case* had no trouble in finding the contract a New York contract, because they simply followed the supreme court of Tennessee. That, therefore, was not the point of decision. The respect in which it reversed the supreme court of Tennessee was merely in its holding that the borrower did not have a vested right to the loan nor the association a legal right (see 99 Tenn., 348; 41 S. W., 1054) to have it consummated, even though the contract had been completed prior to the passage of the act of March 26, 1891. One other thing is to be distinctly noted, that the supreme court of the United States does not approve all that is said by Judge Hammond in 88 Fed., 7. If we pass by some of the rather heated expressions in that opinion, as, for instance, those in which he speaks of the "vaunted police power of a state," and those in which speaking of the public policy declared by the legislature of the state of Tennessee, he says that "possibly the oft-reiterated charge that the real purpose of the legislation was to make fees for the registration officers in the different counties may furnish a clue to the kind of public policy which is the foundation of the legislation"—expressions thrown off, unadvisedly, *currente calamo,* we will see that Judge Hammond himself, at p. 20, 88 Fed., states the proposition, in harmony with *Shannon's case,* as follows: "Foreign corporations that desire such domestication must comply with the provisions of these statutes; and if they carry on their business in the same manner that domestic corporations do, and make their contracts to be performed within the state of Tennessee without compliance with these acts, then they are within the pains and penalties of the statutes. But if they confine their business to their own home places, make their contracts there, to be performed there, as was done in this case, they are not within the pains and penalties of the acts, and such contracts are not affected by them. As to such contracts, it is not within the power of the state to discharge or suspend their obligations." If the learned judge had confined his decision to what he here, and at page

13, says correctly, was the question for decision, to-wit, whether the acts of the Tennessee legislature could suspend or discharge the obligation of this contract made before their passage, he would have relieved us of the necessity of reviewing his opinion on two or three points, which we shall now note.

1. He holds that the local boards are agents of the borrower; the direct contrary of this was held in the unanswerable opinion of Justice Brown in *Knights of Pythias* v. *Withers,* 177 U. S., 260 (20 Sup. Ct., 611, 44 L. Ed., 462), followed by us in *Murphy* v. *Independent Order Sons and Daughters of Jacob of America,* 77 Miss., 830 (27 South., 624, 50 L. R. A., 111), and *Shannon's case,* 78 Miss., 975 (30 South., 51). The obvious fallacy of the reasoning of the learned judge is that he treats the mere specious paper recital in the contract that the local boards are the agents of the borrowers, as conclusive of that fact; when plainly such recital furnishes nothing but a mere presumption that that is true. It is a mere presumption, and subject, like all such presumptions, to be overcome by proof to the contrary. And where as in *Shannon's case* the testimony of the witnesses shows clearly that the local boards were scattered all over the state and that it had been the practice for years for these local boards to receive all payments and solicit loans, all this solicitation and payment of money taking place in this state, these boards all the while acting in everything they did under the orders of the company, and for the company. it is an affront to common sense to deny what is thus made plain, that both parties meant and understood those boards to be the agents of the company, and the money to be payable in Mississippi. Whether one is the agent of another depends not on any mere paper recital—which may easily be worded to hide the real purpose—but on his acts, what he actually does. If his actual conduct, his actual doings every day for years, shows he is acting as agent for the company, then courts would be weak indeed which should hold against these facts that he was agent for the borrower simply because there was a fraudu-

lent paper recital to that effect.    And all these observations apply with equal force to the mere recital that the notes were to be payable in New York.    What we have said in the *Shannon case* on this subject we reaffirm, and refer again here to the authorities from other states on this point, there cited.    It is doubtless an extremely easy method of escaping the labor of investigation to say that local boards are the agents of the borrower, and the moneys are payable in New York, simply because the paper recital says so.    But courts discharge their whole duty only when they look deeper than prepared recitals to the actual facts of every case.    Suppose it were true in a given case that the intention to pay in the foreign state was really true as recited at the inception of the contract, is it possible that it can be contended that it is not in the power of the parties to discharge that feature of the original contract by a long course of dealing to the contrary?    How much stronger is the case when the original recitation was made to evade the positive statute law of a state, and manifestly for no other purpose—the whole course of dealing from the inception of the contract demonstrating this beyond doubt?

2. He says on p. 16, 88 Fed.: "It is decided in *Allgeyer's case* that it can be enforced if the contract is made through the agency of the mails."    With all deference, we hold that nothing of the sort was decided in *Allgeyer's case*.    On the contrary, Mr. Justice Peckham in that opinion (165 U. S., 587, 17 Sup. Ct., 430, 41 L. Ed., 832) says: "In the case before us the contract was made beyond the territory of the state of Louisiana, and the only thing that the facts show was done within that state was the mailing of a letter of notification, as above mentioned, which was done after the principal contract had been made."    Again, at p. 588, 165 U. S., p. 431 (17 Sup. Ct., 41 L. Ed., 832), he says: "We have then a contract which it is conceded was made outside and beyond the limits of the jurisdiction of the state of Louisiana, being made and to be performed within the state of New York, where the premiums were

to be paid and losses, if any, adjusted. The letter of notification did not constitute a contract made or entered into within the state of Louisiana. It was but the performance of an act rendered necessary by the provisions of the contract already made between the parties outside of the state. It was a mere notification that the contract already in existence would attach to that particular property." Again, he says, at p. 592, 165 U. S., p. 432 (17 Sup. Ct., 41 L. Ed., 832): "The giving of the notice is a mere collateral matter; it is not the contract itself, but is an act performed pursuant to a valid contract, which the state had no right or jurisdiction to prevent its citizens from making outside the limits of the state." The learned judge— whom we hold in high esteem—has manifestly misconceived *Allgeyer's case.* Another misconception of his is this: He says at p. 16, 88 Fed.: "I suppose it would be agreed that if the defendant had made the same contract through the agency of the express company it would not have been illegal; or if he had put a messenger on the cars and sent him with a power of attorney to the city of New York, it would not have been illegal. Now, why is it any more illegal to negotiate through persons in Tennessee who are willing to take the burden of attending to the details, and transmitting their correspondence through the mails?" This is answered completely in the language of Mr. Justice White in *Hooper v. California,* 155 U. S., 658 (15 Sup. Ct., 211, 39 L. Ed., 297): "It is said that the right of a citizen to contract for insurance for himself is guaranteed by the fourteenth amendment, and that, therefore, he cannot be deprived by the state of the capacity to so contract through an agent. The fourteenth amendment, however, does not guaranty the citizen the right to make within his state, either directly or indirectly, a contract, the making whereof is constitutionally forbiden by the state. The propositon that, because a citizen might make such a contract himself beyond the confines of his state, therefore he might authorize an agent to violate in his behalf the laws of his state, within her own limits, involves a

clear *non sequitur* and ignores the vital distinction between acts done within, and acts done beyond a state's jurisdiction." This language is quoted and reaffirmed in *Allgeyer's case* by Justice Peckham at p. 588, 165 U. S., p. 431, 17 Sup. Ct., 41 L. Ed., 832. The learned judge in 88 Fed. confuses the case of a single isolated borrowing—as *Allgeyer's case*—with "doing business" in the state—a very different thing indeed. The dissenting opinion in *Hooper's case* shows at p. 661, 155 U. S., p. 212, 15 Sup. Ct., 39 L. Ed., 297, this very difference, the dissenting justices saying: "This single act of the company cannot be held to prove that it proposed to transact business in that state, or that it contemplated the issuing of any other policy to a resident of California. . . . Indeed, the prosecution in the present case manifestly had in mind the difference between a single act of insuring property and 'proposing to transact insurance business by agent or agents.' ' Again, at the bottom of the page, it is pointed out "as an abridgment of the privileges, not of a foreign corporation, but of individual citizens of other states," etc. We are not dealing in this case with a single individual citizen borrowing from appellant having made his contract out of the state in New York and giving them notice collaterally by mail or not; we are dealing with the case of a foreign corporation transacting an immense business in the state, through a large number of local boards of control—its own agents manifestly—such foreign corporation having thus localized its business in this state and having—precisely as was done in Oregon, *Stanley's case, supra*—become domesticated here, as to that business. If on facts like these, under statutes such as we have on usury, and the laws taxing "each local board" or "branch" or "agency" of a foreign building and loan association, the state has no power to declare this contract violative of our statutes and public policy, then indeed is the boasted authority of a state to prevent infraction of its positive statute law, and its public policy by a foreign corporation a meaningless platitude—a veritable mockery. But we find and quote,

to give it our most unqualified indorsement, a most able state-
ment of this view in the supreme court of the United States in
*Hooper* v. *California,* 155 U. S., 658 (15 Sup. Ct., 211, 39 L.
Ed., 297), where the court, through Mr. Justice White, says:
"If the contention of the plaintiff in error was admitted, the
established authority of the state to prevent a foreign corpora-
tion from carrying on business within its limits, either abso-
lutely or except upon certain conditions, would be destroyed.
It would be only necessary for such a corporation to have an
understanding with a resident that in the effecting of contracts
between itself and other residents of the state, he should be
considered the agent of the insured persons, and not of the
company. This would make the exercise of a substantial and
valuable power by a state government depend not on the actual
facts of the transactions over which it lawfully seeks to extend
its control, but upon the disposition of a corporation to resort
to a mere subterfuge in order to evade obligations properly im-
posed upon it. Public policy forbids a construction of the law
which leads to such a result, unless logically unavoidable."
There is no such vagueness about the phrase "doing business
within the state," or "negotiating business within the state"—no
"such ambiguity or elasticity in its quality," as seems to be
apprehended by the learned judge in 88 Fed., at p. 17, we hum-
bly submit. The United States supreme court has made the
meaning of that phrase, to our thinking, clear as light. This
appellant was "doing business in this state" within the defini-
tion of that phrase by the federal supreme court, and doing it
through its own agents—its local boards—as held by the fed-
eral supreme court in *Knights of Pythias* v. *Withers, supra.*
We refer again here to the citation from *Stanley's case* in the
opening of this opinion, as to what constitutes "doing business
in a state."

We have thus at some length noticed the *Bedford case* as set
out in 88 Fed., 7, in 181 U. S., 227 (21 Sup. Ct., 597, 45 L.
Ed., 834), and also *Allgeyer's case,* with the view of satisfying

the thoroughly industrious and very able counsel of the appellant. It may be a vain effort to satisfy one, who seems to doubt so strongly, but so high is the regard in which we hold him, that we have undertaken the task in the hope that a more patient and thorough examination of this case and the others to which we have referred in this, and in the cases of Shannon and Wilson, will enable him to concur in the correctness of the conclusion at which we have arrived, on our statutes, and the facts in our cases.

It is only necessary to add that the court properly, under our statutes and practice struck from the files the amended notices and pleas, the object of which was to inject into the case, nearly two years after the cause had been at issue, and ready for hearing, a federal question. It is clearly shown that the appellant, after its motion to remove the cause to the federal court had been overruled July 29, 1899, filed the plea of general issue, with elaborate notice, on September 27, 1899; that afterward, without having first obtained leave of the court, it filed, on April 20, 1901, some 18 months after the cause was at issue, an amended notice—a wholly different notice—under its plea of the general issue; and that later, on August 6, 1901, again without having obtained leave to do so, it filed an amendment to its pleas, and an amended—so-called—notice, wholly different from its first notice, nearly two years after the cause had been at issue and ready for trial. This effort, by these amendments to the pleas and notice, was simply an after-thought, an effort at that late stage, to inject a federal question into the record. Appellant also asked an instruction and filed a series of reasons why it should be granted. It was an extraordinary procedure to file with a requested instruction a page or two of written reasons why it should be granted. The purpose was obvious. It was another ingenious but unsuccessful effort to inject the federal question into the record. If the court had allowed the amended notice and pleas to be filed, which presented nothing on the merits but simply the alleged federal

question, then there would have been an issue involving the federal question, to which an instruction would have been appropriate. But the court had very properly, in accordance with our statutes and practice, refused leave to file the amended pleas and notices, and stricken them from the files on the obvious ground that appellant had presented them entirely too late— nearly two years after the cause had been fully at issue and waiting for trial. Such delay was gross laches and the court properly refused the leave to file them.

*Affirmed on direct appeal and reversed on cross-appeal.*